HANK v. LAMB.

1. INTOXICATING   LIQUORS—CONTRACTS—PROCESSING   WINE—BOT-TLING.

Where contract of sale of natural wine did not include a duty on the part of the vendor to process it and buyer did not furnish bottles for natural wine, the vendor was not at fault for not bottling the wine although they had agreed to bottle the wine, bottling of natural wine in bottles labeled for processed wine, as furnished by plaintiff, being contrary to State and Federal requirements.

---

Parol evidence rule, merger of preliminary oral statements in writing, see 1 Restatement, Contracts, § 237; ambiguity exception, §§ 231–233; ambiguity and fraud, § 233 (b).

2. SAME—BOTTLING WINE—PROCESSING.

The word "bottle," when used as a verb in connection with placing wine in containers, does not imply processing.

3. CONTRACTS—INTOXICATING LIQUORS—PRACTICAL CONSTRUCTION—EVIDENCE.

Evidence introduced in assumpsit for breach of a contract relative to sale of natural wine did not support plaintiff's claim that a practical construction of the contract by the parties would require that vendor process the wine so as to permit it to be bottled as a processed wine.

4. SAME—PRECEDING CONVERSATIONS MERGED INTO WRITTEN CONTRACT—PLEADING.

It is presumed that all preceding conversations are treated as merged into a written contract where declaration in action for breach thereof does not allege that part of the contract rests in parol.

5. SAME—CONSTRUCTION.

·If the terms of a contract are so plainly expressed that there is no ambiguity, the terms of the contract control in the absence of fraud or mistake, and an intent differing from the plain terms of the contract cannot be read into it.

6. SAME—CONSTRUCTION—PROCESSING WINE.

The matter of processing 20,000 gallons of natural wine may not be said to be the duty of the defendants, vendor and storer thereof, where written contract relating to its sale to plaintiff buyer was silent with respect to the matter of processing it and there are no surrounding circumstances of a paramount or compelling. nature requiring that contract be so construed as to impose the duty to process upon such defendants.

7. TROVER AND CONVERSION—DEMAND BEFORE ACTION BEGUN—EVIDENCE.

In action to recover damages for conversion of plaintiff's cases of wine bottles, evidence *held*, insufficient to show that a demand had been made upon defendants therefor or any act showing conversion had occurred before action was begun.

Appeal from Van Buren; Warner (Glenn E.), J. Submitted October 4, 1944. (Docket No. 50, Calendar No. 42, 836.) Decided November 30, 1944.

Action by Bernard J. Hank against Ross H. Lamb and Houppert Wine Company, a Michigan corpora-

tion, for damages resulting from a failure to bottle wine and for conversion of bottles. Judgment for plaintiff. Defendants appeal. Plaintiff cross-appeals. Reversed without new trial.

*Anderson, Anderson & Anderson,* for plaintiff.

*Stearns, Sharpe & Stapleton,* for defendants.

Reid, J. This is an action in assumpsit tried without a jury. From a judgment allowing plaintiff's claim in part the defendants take a general appeal. Plaintiff takes a cross appeal from partial disallowance of his claim.

Plaintiff claims damages for failure to fulfill an agreement to bottle or package, described in his brief as "to process," 20,000 gallons of natural wine; to furnish 75 barrels for use in barreling the wine; also, for failure to return 1,782 cases of empty bottles furnished to defendants by plaintiff for bottling the wine.

Defendants for grounds of appeal allege error in allowing damages for the 1,782 cases of bottles not returned, in finding defendants in default as to their contract, in allowing damages on claim that defendants failed to bottle 1,782 cases of wine, and in so interpreting the contract as to require defendants to process the wine.

Plaintiff took a cross appeal, claiming error in limiting plaintiff's recovery to 1,782 cases of bottles and in not allowing plaintiff damages for failure of defendants to bottle and package (also described in his brief as "processing") the entire 20,000 gallons of wine.

Plaintiff declares on a written contract, a copy of which is attached to the declaration as exhibit A, which, with underwriting by the company, is as follows:

"Transfer of Wine

"In consideration of the transfer and assignment to me of 25,415 shares of common stock of the Houppert Wine Company, evidenced by certificates number 31, 32, and 33 in the name of Bernard J. Hank, I hereby sell, assign and transfer unto the said Bernard J. Hank all of the wine in cask No. 5 located in the west plant of the Houppert Wine Company of Lawton, Michigan, being 8,675 gallons of natural wine and all of the wine in cask No. 7 in said west plant in said wine company, being 7,750 gallons of natural wine and also 3,575 gallons of natural wine in cask No. 12 in said west plant of said company, and I represent that I am the owner of all the said wine and I have the right to sell the same and that said wine is free and clear of all liens and encumbrances of any and every kind, and as further consideration for the transfer of said shares of stock, I herewith pay the said Bernard J. Hank the sum of $3,000 and I agree to pay the Federal tax on said wines.

Dated at Lawton, Michigan, this 15th day of September, 1942.

"ROSS H. LAMB.

"Witness: WM. P. BENSON,
     F. C. GILLETTE.

"I agree that the Houppert Wine Company will furnish, no charge, 75 barrels to be used to barrel said wine and agree that it will barrel or bottle and package said wine upon request and payment by transferee of our costs only of barrels and/or bottles.

Ross H. LAMB.
Witness: F. C. GILLETTE     WM. P. BENSON.
     Sept. 15, 1942

"The Houppert Wine Company hereby agrees and guarantees to carry out the foregoing agreement as to bottling and/or barreling.

HOUPPERT WINE CO.,
     By WILLIAM C. HOUPPERT, Pres.
     By W. R. PAYNE, Secy."

Defendant Lamb paid the $3,000. Plaintiff claimed that it was also verbally understood that Lamb was to process or procure the processing of the natural wine by the company to qualify the wine as ''Rosalie'' wine. Defendants declined so to do. Plaintiff furnished 1,782 cases of empty bottles with the word ''Rosalie'' blown in the glass. It seems that it would be contrary to State and Federal requirements to place natural or unprocessed wine into bottles with the label ''Rosalie,'' a copyrighted trade name with a trade status indicative of processed wine of a definite standard. Defendant Lamb therefore declined to cause any part of the wine to be placed in these bottles. Part of the bottles were sold to Michigan Wineries, Incorporated. The remainder are in the hands of the Houppert Wine Company or defendant Lamb.

It will readily be seen that without inclusion in exhibit A of the duty to process the wines and plaintiff not having furnished any bottles for natural wine, defendants were not at fault for not bottling the wine. Plaintiff afterwards sold the wine at less than processed wine would sell for and claims a loss of $5,000 on that account, or $.25 a gallon for the 20,000 gallons.

It was testified that processing the wine would involve several distinct operations: (a) addition of 25 per cent. of California wine; (b) pasteurization; (c) coloration; (d) removal of tartrates including freezing and filtration; (e) possible addition of fortifying brandy; (f) addition of sugar.

Defendants claim they were not bound to do any of these things and that the written agreement, exhibit A, spoke only of natural wine, which means wine not processed. Plaintiff made no offer to furnish materials other than the 1,782 cases of bottles or pay expense necessary to processing. Some correspondence occurred between plaintiff, who lives in Chicago, and

Houppert Wine Company at Lawton, Michigan. Plaintiff claims he did not at any time request defendants to cause the wine to be bottled as natural wine.

In October, 1942, defendant Lamb knew that plaintiff expected the wine would be processed into Rosalie wine before being bottled but defendants deny that they ever undertook to do so at their own expense. Defendant Lamb testified that in April, 1943, he telephoned plaintiff that he couldn't make it Rosalie but would bottle it as natural wine, which statement plaintiff denies.

Exhibit A specified that Houppert Wine Company "will furnish, no charge, 75 barrels to be used to barrel said wine and agree that it will barrel or bottle and package said wine upon request and payment by transferee of our costs only of barrels and/or bottles," but the entire matter of processing and cost thereof is outside the written agreement. The declaration does not allege that part of the contract rests in parol. There is direct conflict in the testimony as to who should bear the burden of processing, which evidently should precede bottling. The word "bottle" as a verb does not imply processing.

Plaintiff claims a practical construction by the parties favorable to his contention. All that was done was that plaintiff furnished part of the bottles necessary to bottling as Rosalie. Defendants did not thereupon undertake or begin to process the natural wine into Rosalie wine, waited for plaintiff to make arrangements so to do, and claim they then offered to bottle it as natural wine. This does not show the practical construction plaintiff contends for.

Plaintiff in his letter dated April 28, 1943, to defendant Houppert Wine Company, wrote as follows:

"When your Mr. Lamb telephoned me on Monday he said that it was your intention to keep your written

agreement with me about bottling or barreling the wine, as represented by the 20,000 gallons in casks No. 12, 5 and 7. Mr. Lamb said that you had a deal on with Michigan Wineries, and that it was his thought that my wine would be sold as part of the deal. Of course, I will want to figure out the way in which I will come out the best in dollars and cents, and I told Mr. Lamb I would be prepared to act in a reasonable length of time, consistent with good business practice. He also mentioned that you had 6,800 lbs. of sugar on hand.

"Please let me know if you will use this 6,800 lbs. of sugar to make sweet wine for me, and how long it will take you to bottle it. I should also like to know how long it will take you to barrel the rest of the wine, or in case sweet wine is not made, all of the 20,000 gallons.

"In replying, please advise me also if you will buy the barrels necessary beyond the 75 barrels which you are to furnish at no cost to me, in accordance with our written agreement.

"At this time it looks as though I can do better elsewhere than the most recent offer of Mr. Lamb of $10,000 made over the telephone to me on Monday in the course of the call he made to me. When Mr. Houppert called me before that he had offered $8,000 for the warehouse receipt. When Mr. Houppert was in town the other day he told me that you would sell the bottles that I bought from Ball Bros. I have just written Ball Bros. to ask them what they can do about their sale in case I don't use them, and the price."

The reference in this letter to 6,800 pounds of sugar (a necessary ingredient in processing for Rosalie wine), the request that defendant company use it "to make sweet wine for me," *not* to make sweet wine in fulfillment of the agreement, and also the expression, "how long it will take you to barrel the rest of the wine, or *in case sweet wine is not made, all of the 20,000 gallons*" (italics supplied), taken in view of

all the circumstances, amount to indications creating doubt as to the correctness of the contention of plaintiff, who wrote the letter. This letter in fact could be construed by implication against plaintiff's claim that the defendants were under contract to process the 20,000 gallons. Plaintiff relies upon oral statements before the contract was signed and upon the mental understanding of the parties to show "that the phrase 'will barrel or bottle and package said wine upon request and payment by transferee of our costs only of barrels and/or bottles,' meant that this wine should be made into Rosalie wine and bottled as such."

While we consider, in response to claims in plaintiff's brief, the testimony as to statements outside of the written contract, it is not to be inferred that we intend to modify or change in any degree or particular the rule of presumption that all preceding conversations are merged in the written contract.

Defendant cites *Edison Sault Electric Co.* v. *Manistique Pulp & Paper Co.*, 278 Mich. 592, at p. 596:

"If the terms of a contract are expressed in words of such clear and definite meaning that there is no ambiguity, in the absence of fraud or mistake (of which no claim is here made), the terms of the contract, control. An intent differing from the plain terms of the contract cannot be read into it."

See cases there cited; also *Michigan Chandelier Co.* v. *Morse,* 297 Mich. 41, 49; and *Mieske* v. *Harmony Electric Co.,* 278 Mich. 61, 66.

No fraud is alleged or proved in the execution of exhibit A sued on. There cannot be said to be any ambiguity as to the party liable for expense of processing the wine as this matter is not referred to in the written agreement either expressly or impliedly. There are no surrounding circumstances of a paramount or compelling nature which would require or even suggest that the meaning and interpretation re-

lied on by plaintiff must be given to the written contract.

The trial judge was in error in reading into exhibit A an undertaking on the part of defendants to process the natural wine, in consequence of which interpretation there was included in the judgment an item.of $1,069.29 for failure to bottle 1,782 cases of wine in the Rosalie bottles, which item must be disallowed.

There is confusion in the testimony as to the disposition of the 1,782 cases of bottles. Plaintiff Hank testified,

"I did not have any arrangement or agreement whatsoever with the Michigan Wineries to buy or pay for any of my bottles."

Then immediately on cross examination he testified further:

"*Q.* Did you authorize Mr. Donald Anderson * * * to dispose of your bottles? * * *

"*A.* I authorized them to get them if they could and then to sell them if they could. Yes."

Following this testimony, plaintiff's attorney, Donald E. Anderson, testified,

"I did not make the sale that was made to the Michigan Wineries of these bottles, nor did I have anything to do with it."

And on cross examination,

"*Q.* You testified this morning that you made some kind of a deal with the Michigan Wineries?

"*A.* Yes, sir.

"*Q.* What was that?

"*A.* I talked with Mr. Turner and he said that he would take any of those bottles that we were able to procure for him, and that he would give us for them the cost price to Mr. Hank.

"*Q.* And you agreed that that was all right?

"*A.* Yes, sir.

"*Q.* Then you knew that later he did take some?
"*A.* You mean the Michigan Wineries later took some of them?
"*Q.* Yes?
"*A.* I found that out later. Yes, sir."

In the forenoon, before giving the above-quoted testimony, Mr. Anderson had testified,

"I contacted Mr. John Turner of the Michigan Wineries to see if he would be interested in the purchase of the bottles. He said that he would take any bottles that we could furnish him up to 20,000 cases."

It appears from an invoice dated September 15, 1943, in evidence, that 745 cases of the bottles were shipped to the Michigan Wineries. Deducting that number from 1,782 cases, the original number, would leave 1,037, which it is clear is the maximum for which plaintiff could have been allowed, under any theory.

However, defendants claim that these 1,782 cases of bottles were delivered by plaintiff at Houppert Wine Company's plant, in an effort on the part of plaintiff to get defendants to process the natural wine, that defendants never assumed the cost of such processing, never claimed to own the bottles, never accepted the delivery in the spirit and with the meaning claimed by plaintiff, and never refused plaintiff his right to take the bottles back.

On May 14, 1943, which was a Friday, plaintiff's attorney, Donald E. Anderson, went to the plant of the defendant company in Lawton, Michigan, and there "made inquiry as to stamps," the purpose of his visit being "asking for Mr. Hank, the stamps and the bottles or other equipment." Referring to this occasion on May 14th, he testified,

"The first time I went over there I went primarily to see Mr. Lamb. He was not in. I talked with Mrs.

Maxwell. She told me that they had the stamps, she believed that they had the bottles, and that I should come back the following day and talk with Mr. Houppert and perhaps Mr. Lamb would be there. Mrs. Maxwell is the woman that apparently has charge of the office of the Houppert Wineries in Lawton. I didn't see any of the men that day.

"The following day, which was on Saturday, I went back. I saw Mr. Houppert that day. He went to the—I found him at his house—he went to the office with me and got the stamps for me and turned them over to me. He told me on that day that they had the bottles still stored in the west plant of the Houppert Winery; that it was a little difficult to get into the plant due to conditions but there was no reason why we should not have them or other equipment. But he didn't make any effort to get them. He said he would like to talk with Lamb about it first. May 14th was the date of my first talk with Mr. Houppert, and was the date that I actually received the stamps."

Four days later, May 18, 1943, this suit was begun. No other demand, or anything doing away with the necessity of making a demand before suing to recover damages for conversion of these cases of bottles, or any act showing conversion, had occurred. After suit was begun, plaintiff claims he was given "the run-around" and that actions on the part of defendants occurred which would warrant the assumption that a demand would have been futile.

This showing is insufficient to establish conversion before suit was begun and thus to charge defendants with liability for the value of the bottles.

According to his additional memorandum filed March 8, 1944, the trial judge stated:

"The reasons for said decision were—

"1. Defendants are indebted to plaintiff for 1,782 cases of bottles furnished and delivered, valued at $817.41.

"2. Defendants are liable for nonperformance of contract. They failed to bottle 1,782 cases of wine and the damages were 60 cents per case, or $1,069.20.

"3. Interest was allowed at 5 per cent. from October 1, 1942, to March 1, 1944, on $817.41 and $1,069.20, total interest $133.63.

"4. These amounts were added and thus was determined the amount of $2,020.24."

Neither of the two items thus allowed with interest have any sufficient foundation in the testimony and for the reasons hereinbefore given all items must be disallowed.

On May 6, 1943, plaintiff sold his wine to Michigan Wineries, Inc., for $18,000.

No claim is made that plaintiff at any time requested that the wine be barreled and defendants never refused to furnish the 75 barrels spoken of in the agreement, if the wine were to be barreled. Plaintiff does not appeal from the disallowance of his claim on account of 75 barrels not delivered.

Judgment is reversed. No new trial is to be had. Costs are allowed to defendants.

North, C. J., and Starr, Wiest, Butzel, Bushnell, Sharpe, and Boyles, JJ., concurred.