VARIOUS MARKETS, INC. and Mark W. Dupuis, Plaintiffs/Counter–Defendants,

v.

The CHASE MANHATTAN BANK, N.A., Defendant/Counter–Plaintiff and Third–Party Plaintiff,

v.

LA FENIX BOLIVIANA DE SEGUROS Y REASEGUROS, S.A., M & M Management Corp., Ferrell Travis Riley, Frank Riley, Treva Shay, Gaelic Union Reinsurance Co. and Dominique Testu, Third–Party Defendants.

No. 94–CV–74294–DT.

United States District Court, E.D. Michigan, Southern Division.

Dec. 1, 1995.

*OPINION AND ORDER REGARDING MOTIONS OF DEFENDANT AND THIRD–PARTY DEFENDANTS FOR SUMMARY JUDGMENT*

ROSEN, District Judge.

## I. *INTRODUCTION*

This matter is presently before the Court on three motions for summary judgment:

(1) Motion of Defendant Chase Manhattan Bank to Dismiss the Complaint, or in the Alternative, for Summary Judgment;

(2) Motion of Third–Party Defendant La Fenix Boliviana de Seguros y Reaseguros ("LFB") for Summary Judgment on the Third–Party Claim of Chase Manhattan Bank; and

(3) Motion of Third–Party Defendants M & M Management Corporation, Ferrell Travis Riley, Frank Riley and Treva Shay to Dismiss the Third–Party Complaint of Chase Manhattan Bank, or in the Alternative for Summary Judgment.

Having reviewed and considered the parties briefs and supporting documents, and having further heard the oral arguments of counsel at the hearing conducted on November 9, 1995, the Court is now prepared to rule on these Motions. This Opinion and Order sets forth that ruling.

## II. *FACTUAL BACKGROUND*

The claims in this action arise out of a dispute concerning property insurance for a condominium development in the Virgin Islands in which Defendant Chase Manhattan Bank ("Chase") has a mortgagee's interest (the "Chase VI program"). According to the allegations in Plaintiffs' Complaint and Defendant's Counterclaim, Various Markets, Inc. ("VMI"), a Warren, Michigan-based insurance broker allegedly specializing in locating sources for insurance coverage for hard-to-place risks, was contacted by Chase in early 1993, and asked to assist it in locating insurance for the Chase VI program.

In addition to the usual hazards, the Chase VI insurance program had to protect against the risk of hurricanes. The real property

Gregory Thomas, Robert Fortunate, Detroit, Michigan, for plaintiffs.

Lee W. Brooks, Stanley Prokop, Detroit, Michigan, for defendant.

that the insurance would cover was allegedly worth more than $90 million. The hurricane season in the Virgin Islands begins in early summer, which gave an added urgency for Chase to have an insurance program in place as that season approached in 1993.

VMI proposed that Chase enter into an insurance policy with LFB, a Bolivian insurance company. LFB, however, lacked sufficient resources to insure the entire risk involved in the Chase VI program. Chase was aware of LFB's limited resources, but agreed to use LFB as the primary insurer if LFB would obtain reinsurance acceptable to Chase.

It is alleged that in July 1993, VMI provided Chase with a list of insurance entities which would participate in LFB's reinsurance for catastrophic coverage in the Chase VI program. The listed participants included Lloyd's of London and another well-regarded London reinsurance firm, the D.P. Mann Syndicate. D.P. Mann was described as the proposed "lead underwriter", and it was represented that D.P. Mann's proportion of participation would be 75% of the maximum exposure.

At the end of July, Mark Dupuis, the president of VMI, informed Chase that as soon as VMI received payment of the premium, all of the insurance and reinsurance would be in place, including the participation of the Mann Syndicate.

On August 9, 1993, Chase had the entire annual premium amount of $1,693,866 wired to VMI.[1] The next day, however, Gaelic Union, the company allegedly acting as LFB's broker in the London market to obtain reinsurance, informed VMI that the Mann Syndicate had withdrawn from the Chase VI program. VMI, however, did not inform Chase that Mann had withdrawn until late August 1993, as the Virgin Islands entered the height of the hurricane season.

When Chase communicated its dissatisfaction and displeasure concerning the Mann Syndicate situation, VMI allegedly represented that it had a substitute for Mann and that the lead reinsurer they proposed to submit to the Virgin Islands insurance examiner for approval would be Provident Capital Indemnity Limited ("PCI"). VMI represented that PCI was a reputable reinsurance company. However, four weeks later, when Chase met with the Virgin Islands officials, the Virgin Islands insurance examiners rejected the proposed Chase VI program, and specifically rejected PCI as a reinsurer. According to Chase, the insurance examiners' rejection of PCI was based on the facts that PCI (1) had been banned from doing business in California; (2) had lost its license in Florida; (3) was not paying claims, did not have any liquid assets, and had misrepresented its assets; (4) was owned by individuals who had been indicted in Florida and were fugitives; and (5) reported assets in a Hong Kong bank which had denied having any PCI account.

Allegedly, in the following weeks, VMI and LFB represented to Chase that they were making strenuous efforts to complete the placement of reinsurance, including replacing PCI as lead insurer. When by December 1993 the reinsurance required for the Chase VI program had still not been placed, Chase gave notice that the LFB policy was cancelled and requested that the unearned premium for the balance of the year for which Chase had prepaid be returned to Chase.

Chase requested return of $751,339.40. However, VMI returned to Chase only $171,559.20.[2] The failure to return to Chase $579,780.20 is what precipitated this action.

In the spring of 1994, Gregory J. Gerard, a vice-president of Chase, allegedly telephoned Mark Dupuis of VMI to express Chase's dissatisfaction with the partial refund paid to the bank. VMI alleges that in that telephone conversation, Gerard threatened that Chase would spend so much money in suing VMI

1. Chase alleges that a policy for one year, beginning July 1, 1993 was issued for the Chase VI program. However, none of the parties has provided the Court with a copy of the policy.

2. As discussed *infra*, LFB claims that, pursuant to the terms of the insurance policy, Chase is not

entitled to the full amount it wants refunded. Chase disputes LFB's interpretation of the policy terms. Not having been provided with a copy of the policy, the Court is unable to determine which party's interpretation is correct.

and attacking its licenses that VMI, Dupuis and his family would be destroyed. Gerard purportedly also threatened that he personally would use "whatever means" and "would see to it" that Chase destroyed VMI and Dupuis.

On September 14, 1994, Judah A. Shechter, Chase's Litigation Counsel, wrote Dupuis a two-page, single-spaced letter threatening litigation if Chase was not immediately refunded the $579,780.20 which it claims it was owed. In that letter, Mr. Shechter stated:

> The continued bad faith refusal of VMI and LFB to refund the full unearned premium amount is completely unacceptable. Therefore, please be advised that unless Chase receives a prompt refund of the full unearned premium from VMI, Chase will commence legal proceedings in federal court against VMI, LFB and others to recover all sums owed. The complaint will allege, *inter alia,* causes of action against VMI and LFB for breach of contract, fraudulent inducement to contract, fraudulent misrepresentation, negligent misrepresentation and aiding and abetting LFB in wrongfully converting Chase's property. In addition to seeking $579,780.20 of unearned premiums (plus interest), the lawsuit will seek to recover 1) actual damages sustained by Chase on account of Chase's being forced to obtain other insurance when VMI's program turned out to be unsatisfactory and was not finally approved by the regulators and 2) punitive damages for VMI's gross misconduct in connection with the program.
>
> Let there be no misunderstanding, Mr. Dupuis: legal proceedings *will be commenced* against VMI unless the unearned premium is refunded to Chase. Chase simply will no longer tolerate VMI's stalling tactics and spurious accounting methods and intends to hold VMI, not just LFB, fully responsible for all damages sustained. Furthermore, work on the complaint has already begun and Chase will vigorously prosecute such litigation. In addition, if necessary, Chase will apprise regulatory officials (and others) of VMI's bad faith conduct in connection with the program and will pursue all other available methods in order to recover amounts owed.
>
> I hope this letter conveys the gravity with which Chase regards this situation and the serious adverse consequences to VMI that will result should VMI continue to refuse to refund the unearned premium owed Chase.

[Chase Motion Ex. B, p. 2 (emphasis in original).]

Shechter's letter was copied to five other individuals—Mr. Stephen J. Rhoades, Esq., an attorney for LFB and/or Defendant M & M Management Corp.; Mr. Orlando Nogales, an officer of LFB: Mr. F. Travis Riley, a representative of M.& M Management; Mr. Terry L. Wilcox, identified as a representative of Rollins Hudig Hall (Chase's broker); and Mr. Patrick Donnelly, a representative of The Donnelly Corporation, which allegedly served as an agent of Rollins Hudig Hall on behalf of Chase.[3]

Based upon the spring 1994 threats of Gregory Gerard and Shechter's September 14, 1994 letter, on September 27, 1994, VMI and Dupuis instituted this lawsuit by filing a five-count Complaint against Chase Manhattan Bank in Macomb County Circuit Court. Chase promptly removed the action to federal court alleging diversity of citizenship as the basis for federal subject matter jurisdiction.

In their Complaint, VMI and Dupuis allege that by Gerard's and Shechter's actions, Chase is liable for defamation (Count I); assault (Count II); intentional infliction of emotional distress (Count III); and extortion (Count IV). In Count V, the Plaintiffs allege that Chase's conduct entitles to exemplary damages.

In response, Chase filed a nine-count "Counterclaim and Third–Party Claim" against VMI; Dupuis; LFB; M & M Management Corp. (LFB's representative in the United States); three M & M employees,

---

**3.** Chase states in its Summary Judgment Brief that these individuals were "participants" in the Chase VI program. Other than this statement in Chase's Brief, there is no evidence establishing their specific roles in this matter.

464

Ferrell Travis Riley, Frank Riley and Treva Shay; Gaelic Union Reinsurance Co. (an Irish company which owns 40.5% of LFB); and Dominique Testu, a director of Gaelic Union.

In its Counterclaim and Third–Party Claim, Chase alleges that VMI and LFB are liable for breach of the LFB insurance policy (Count I). Chase also alleges that VMI by failing to deliver insurance suitable for the Chase VI program, VMI breached its contract with Chase (Count II).[4]

In Counts III–VI, Chase alleges that VMI and Mark Dupuis are liable for breach of fiduciary duty (Count III), negligent misrepresentation (Count IV), fraud (Count V), and innocent misrepresentation (Count VI).

Chase also alleges that, by failing to refund all of its premium, LFB is liable to it for conversion (Count VII). The Bank also claims that VMI aided and abetted LFB in its conversion (Count VIII). Finally, in Count IX, Chase alleges that LFB, M & M Management, Travis Riley, Frank Riley, Treva Shay, Gaelic Union and Dominique Testu acted tortiously and "in concert and/or conspiracy" with VMI and Dupuis.

Chase now has moved for summary judgment and dismissal of Plaintiffs' Complaint in its entirety.[5] Third–Party Defendants LFB, M & M Management, Ferrell Travis Riley, Frank Riley and Treva Shay have moved for summary judgment and dismissal of all of Chase's third-party claims against them.[6]

### III. DISCUSSION

#### A. STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[7] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

---

4. Just as the Court has not been provided with any copies of insurance policies, neither has the Court been provided with a copy of the alleged agreement between Chase and VMI.

5. Although captioned as a "Motion to Dismiss", because Chase relies on matters outside the pleadings in support of its motion, pursuant to Fed.R.Civ.Pro. 12(b), the motion will be treated as a Rule 56 motion for summary judgment.

6. No motion has been filed by Gaelic Union or Dominique Testu, nor have they joined in LFB's or the M & M Defendants' Motions.

7. "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A C. Wright, A. Miller, M. Kane, *Federal Practice & Procedure*, § 2727, at 33 (1993 Supp.).

\* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

\* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

\* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989). *See also, Nernberg v. Pearce,* 35 F.3d 247, 249 (6th Cir.1994). The Court will apply the above principles in deciding the motions for summary judgment in this case. The Court will first address Chase's Motion for Summary Judgment on Plaintiffs' Complaint, and then will address the Third–Party Defendants' Motions seeking dismissal of Chase's third-party claims against them.

## B. *CHASE'S SUMMARY JUDGMENT MOTION*

Chase claims that it is entitled to dismissal of Plaintiffs' claim of defamation in Count I of their Complaint by application of the absolute "judicial proceedings privilege". Alternatively, Chase contends that, if they are not afforded absolute immunity from suit, they are nonetheless entitled to entry of summary judgment on Count I by application of the qualified "duty-interest" privilege.

With respect to Plaintiffs' allegations of "assault" in Count II, intentional infliction of emotional distress in Count III, and "extortion" in Count IV, Chase contends that the complained of actions of Chase and its agents, Messrs. Gerard and Shechter, do not establish actionable claims as a matter of law.

Finally, with respect to Plaintiffs' claim for exemplary damages in Count V, only Plaintiffs' defamation claim is subject to an award of exemplary damages but since Plaintiffs did not first demand a retraction from Chase, they cannot recover exemplary damages in this case.

The Court will address each of Defendant's arguments *seriatim.*

1. *UNDER THE FACTS OF THIS CASE, DEFENDANT IS NOT IMMUNIZED BY THE JUDICIAL PROCEEDINGS PRIVILEGE OR THE QUALIFIED "DUTY–INTEREST" PRIVILEGE.*

█ Michigan recognizes that statements which are pertinent to judicial proceedings made by attorneys *in the courtroom or in pleadings* are absolutely privileged, and as such, no cause of action for defamation can be predicated on such statements. *See, Hartung v. Shaw,* 130 Mich. 177, 89 N.W. 701 (1902); *Sanders v. Leeson Air Conditioning Corp.,* 362 Mich. 692, 108 N.W.2d 761 (1961); *Bennett v. Attorney General,* 65 Mich.App. 203, 237 N.W.2d 250 (1975); *Heritage Hills Fellowship v. Plouff,* 555 F.Supp. 1290 (E.D.Mich.1983).

In *Sanders,* the Michigan Supreme Court explained the requirements for the judicial proceedings privilege as follows:

> If statements made in the course of judicial proceedings, *in pleadings or in argument,* are relevant, material or pertinent to the issue, their falsity or the malice of the author is not open to inquiry. They are absolutely privileged. It is only necessary that the language be pertinent, or as some authorities say relevant....

362 Mich. at 695, 108 N.W.2d 761, *quoting Hartung v. Shaw,* 130 Mich. 177, 179–180, 89 N.W. 701 (1902) (emphasis added).

By application of the foregoing rule, the *Sanders* court affirmed a trial court's application of the judicial proceedings privilege under the following facts. Leeson Air Conditioning had obtained a money judgment against Edward Sanders. The company subsequently obtained a writ of execution to execute on Mr. Sanders' property to satisfy the judgment. When the execution was re-

turned unsatisfied, Leeson instituted a second action against Mr. Sanders to enforce the judgment. It was Leeson's opinion that Mr. Sanders, with the assistance of his wife and another individual, had concealed his assets, thus making the assets unavailable for execution. *In the complaint* against Edward Sanders, Leeson made the following assertion of criminality:

That Edward Sanders, Ida Sanders and R.M. Hagelberg are in fact committing a crime and should be restrained by this court from carrying out their conspiracy.

362 Mich. at 694, 108 N.W.2d 761.

Ida Sanders sued Leeson for libel. Leeson moved for dismissal on the basis of the absolute judicial proceedings privilege. The Wayne County Circuit Court found the complained of statements in the complaint to be sufficiently pertinent to the action and granted the defendant's motion for dismissal. The Michigan Supreme Court affirmed.

■ Relying on *Sanders*, Defendant Chase Manhattan Bank argues that Michigan would apply the judicial proceedings privilege to the letter sent by its litigation counsel to VMI's president, Mark Dupuis, accusing VMI of engaging in "spurious tactics" and bad faith conduct, and threatening to sue VMI and to inform the regulatory authorities about VMI's actions.[8]

Chase's contention that Michigan would extend the absolute judicial proceedings privilege to a pre-lawsuit letter has no legal support whatsoever. In fact, the Michigan Supreme Court has expressly *refused* to so extend the privilege. In *Timmis v. Bennett*, 352 Mich. 355, 89 N.W.2d 748 (1958), the defendant was sued based upon libelous statements made in a letter. He argued that since he wrote the letter in his capacity as a lawyer to advise the plaintiff that his client was contemplating instituting a lawsuit to sue him for damages, the absolute judicial proceedings privilege should apply. The Supreme Court refused to extend the privilege to such pre-litigation out-of-court statements, explaining:

8. Chase also cites several cases from other jurisdictions in which pre-litigation statements were found under applicable law to be privileged. However, since those cases did not involve Mich-

Our court recognizes the rule of absolute privilege, *but has repeatedly refused to extend its application beyond the necessities of the judicial, legislative and military occasions.*

\*    \*    \*    \*    \*    \*

The mere fact that defendant contemplated starting an action for damages on behalf of [his client] involving the acts of plaintiff ... does not bring the situation within the general recognized rule. *While an attorney may not be held liable for statements, even though false and malicious, made during the course of the trial, or as part of a judicial proceeding, he may not claim absolute immunity with respect to slanderous and libelous statements otherwise published ....* In the case at bar, the factual situation does not permit immunity from liability for libelous statements published by defendant, if they were in fact untrue and libelous, on the ground of absolute privilege because of his professional status. *The letter on which this action was based was not part of any case in court or any other judicial proceeding. The fact that such a case was in contemplation does not alter the situation in this respect ....*

352 Mich. at 363–365, 89 N.W.2d 748 (emphasis added).

In the alternative, Chase argues that because the Shechter letter was only "published" to individuals having an "interest" in the Chase VI program, it is entitled to the protection of the qualified "duty-interest" privilege.

■ In general, a qualified privilege is recognized where public policy pre-supposes the frank communication on certain matters between persons standing in particular relationships to each other outweighs the damage to individuals. *Merritt v. Detroit Memorial Hospital*, 81 Mich.App. 279, 284, 265 N.W.2d 124 (1978)

igan law (which the parties accept as applicable to this action), that Ohio and Kentucky might apply the privilege to defamatory statements in a pre-lawsuit letter is irrelevant.

Qualified privilege extends to all communications made in good faith upon which the party communicating has an interest, or in reference to which he has a duty, to a person having a corresponding interest or duty.

*Id.* at 284–285, 265 N.W.2d 124.

■ Defendant alleges that Chase had an interest in the Chase VI insurance program and that Shechter only published the letter to individuals who also purportedly had an "interest" in that program. However, Chase has not come forward with any evidence to support this bare allegation. More importantly, merely having a shared interest in some aspect of the subject matter of the letter does not amount to the kind of interest Michigan courts look to in applying the privilege. *See e.g., Tumbarella v. The Kroger Company,* 85 Mich.App. 482, 494, 271 N.W.2d 284 (1978) (security officers had qualified privilege to report suspicions of employee's theft of merchandise to management personnel responsible for hiring and firing); *Bolton v. Walker,* 197 Mich. 699, 164 N.W. 420 (1917) (statements made by president of City's commission on the poor to city council subject to qualified duty/interest privilege); *Rosenboom v. Vanek,* 182 Mich.App. 113, 451 N.W.2d 520 (1989) (report by victim of sexual assault made to university's Sexual Assault Counseling Center held qualifiedly privileged). In this case, Shechter's letter to Dupuis accused VMI of bad faith refusal to refund to Chase the premium amount it had paid and of engaging in "stalling tactics and spurious accounting methods" and threatened to institute legal proceedings against Dupuis and VMI. Shechter further advised Dupuis in his letter that "if necessary, Chase [would] apprise the regulatory officials (and others) of VMI's bad faith conduct in connection with the program." Chase's broker and its broker agent had no "interest" in Chase's pursuit of its legal remedies or in being apprised of Chase's intent to notify regulatory authorities.

In short, a commonality of "interest" in the insurance program (if indeed all of the recipients of the letter truly had such a commonality of interest) is not the kind of interest "where public policy pre-supposes the necessity of frank communication" with other purportedly "interested" parties.

For these reasons, the Court finds that Defendant's Motion for Summary Judgment on plaintiffs' allegations concerning the Shechter letter in Count I of Plaintiffs' Complaint will be denied.[9]

## 2. *PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR ASSAULT*

■ An "assault" is defined as

*any intentional unlawful offer of corporal injury to another person by force,* or force unlawfully directed toward the person of another, under circumstances which create *a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact.*

*Espinoza v. Thomas,* 189 Mich.App. 110, 119, 472 N.W.2d 16 (1991).

Plaintiffs' only basis for their claim of assault is (1) the alleged long-distance (New York to Michigan) telephone threats made by Gregory Gerard to Mark Dupuis that Chase was going to spend so much money suing VMI that it would financially ruin VMI, Dupuis and his family and (2) the letter from Judah Shechter sent from New York to Michigan, threatening to sue VMI and to report VMI's and Dupuis' activities to regulatory authorities. These long-distance threats did not include an "unlawful offer of corporal injury to another person by force", and could not possibly have created a "well-founded apprehension of imminent physical contact". Moreover, Gerard and Shechter clearly lacked the "present ability to accomplish" physical contact.

Thus, it is clear that Plaintiffs' bare allegations of assault have no legal merit. Therefore, Count II will be dismissed.

---

**9.** To the extent that Plaintiffs' seek to hold Chase liable for defamation predicated upon the Gerard telephone call, however, as Defendant points out in its Brief, Plaintiffs have not alleged that the statements made by Gerard in his spring 1994 telephone conversation with Mark Dupuis were published to any third party. Statements made only to the plaintiff are not actionable as defamation. *Bufalino v. Maxon Bros., Inc.,* 368 Mich. 140, 150, 117 N.W.2d 150 (1962).

### 3. PLAINTIFFS' EXTORTION CLAIM SHOULD SIMILARLY BE DISMISSED.

■ Plaintiffs' extortion count will also be dismissed for similar reasons.

M.C.L. § 750.213, a criminal statute, delineates the elements of extortion. It provides:

Any person who shall, either orally or by a written or printed communication, maliciously threaten to accuse another of any crime or offense, or shall orally or by any written or printed communication maliciously threaten any injury to the person or property or mother, father, husband, wife or child of another with intent thereby to extort money.....

M.C.L. § 750.213. See also, Edwards v. Grisham, 339 Mich. 531, 64 N.W.2d 715 (1954) ("[U]nlawful and malicious threats may by reason of their intended results become actionable." Id.)[10]

Plaintiffs here have alleged that Chase threatened to file suit if funds owing were not paid. While Plaintiffs do allege that Chase promised that litigation would be costly, this does not amount to such "injury to person or property" to amount to extortion.

Harris v. NCNB National Bank, 85 N.C.App. 669, 355 S.E.2d 838 (1987), is factually similar to this case. In Harris, the plaintiff's suit for defamation, extortion, intentional infliction of emotional distress and unfair trade practices, like this action, was predicated upon a letter which threatened that the defendant bank would file a lawsuit unless it was paid $20,500 which the bank claimed it was owed. The trial court dismissed the plaintiff's extortion claim, and the appellate court affirmed, explaining:

Extortion may be defined as wrongfully obtaining anything of value by threat, duress, or coercion. Illegality is the founda-

tion on which a claim of coercion or duress must exist.... [T]he filing of a civil suit to establish a claim, whether the claim be ultimately determined to be well founded or not, will not in itself be sufficient to show any wrongful duress imposed upon the defendant in such suit. *A statement of intention to file suit to enforce one's claimed legal rights is neither a threat nor the exercise of unlawful or wrongful coercion.*

*Id.*, 355 S.E.2d at 842 (citations omitted).[11]

This court finds *Harris* instructive. Judah Shechter's statements that unless VMI promptly refunded Chase's premium, Chase would institute costly legal proceedings and, through its pursuit of its proposed lawsuit, would financially "destroy" VMI and Dupuis does not amount to a threat or the exercise of unlawful coercion giving rise to a legally cognizable claim for extortion. Under Plaintiff's reading of the law *any* demand letter would effectively give rise to an extortion claim.

At oral argument, Plaintiffs also claimed extortion based upon the phone call from Gregory Gerard, Chase's vice-president, in which Gerard allegedly threatened Dupuis that Chase would spend so much money in suing VMI and attacking its licenses that VMI, Dupuis and his family would be destroyed. Although the tenor of the phone call may have been stronger than the letter and more distasteful in tone, it remains that Chase was asserting its *legal* rights to prosecute a lawsuit and challenge VMI's licenses. It was not *unlawful* coercion. This Court does not believe that the Michigan legislature intended that facts such as these would give rise to an action under the extortion statute, or the Michigan courts would recognize a civil extortion suit under these circumstances.[12]

10. The *Edwards* case actually involved a violation of the National Labor Relations Act against union employees for threatening to shut down a business. The NLRA has a provision making threats to shut down a business an unfair labor practice. There do not appear to be any reported Michigan civil cases involving allegations of extortion.

11. The court also affirmed the dismissal of Harris' defamation, intentional infliction of emotional distress and unfair trade practices claims.

12. Plaintiff's reliance on *Domestic Linen Supply & Laundry Co. v. Central States*, 722 F.Supp. 1472 (E.D.Mich.1989), is misplaced. *Domestic Linen* involved a RICO and Hobbs Act action predicated upon the Teamsters' violations of the Labor Management Relations Act for unlawfully engaging in "concerted activities". Domestic

### 4. PLAINTIFFS' CLAIM OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS IS WITHOUT LEGAL MERIT

In *Roberts v. Auto Owners Insurance Co.,* 422 Mich. 594, 602, 374 N.W.2d 905 (1985), the Michigan Supreme Court declined to adopt the tort of intentional infliction of emotional distress into Michigan jurisprudence on the facts presented in that case, but described the standards that would have to be met for satisfaction of such a claim:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he had intended to inflict emotional distress, or even that his conduct has been characterized by "malice" or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regard as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

> The liability clearly does not extend to mere insults, indignities, *threats,* annoyances, petty oppressions or other trivialities. *The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language,* and to occasional acts that are

definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt. *There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.*

*Id.* at 602, 374 N.W.2d 905, *citing,* Restatement, Torts 2d § 76 comment d (emphasis added).

■ Moreover, where the defendant does no more than insist upon his legal rights, no liability for intentional infliction of emotional distress will be imposed. *Ledl v. Quik Pik Stores,* 133 Mich.App. 583, 591, 349 N.W.2d 529 (1984); *Warren v. June's Mobile Home Village & Sales, Inc.,* 66 Mich.App. 386, 392, 239 N.W.2d 380 (1976). This is so even when the actor is aware that such insistence upon his legal rights is certain to cause severe emotional distress. *Sankar v. Detroit Board of Education,* 160 Mich.App. 470, 483, 409 N.W.2d 213 (1987).

In *Warren v. June's Mobile Home Village & Sales, supra,* the plaintiff sued for intentional infliction of emotional distress based on allegations that the defendant threatened to evict her, called her on the phone several times, once at 1:00 a.m. when he proceeded to scream at her, repeatedly berated and announced his disdain for her in public and told plaintiff's neighbors that she was a "bitch". The trial court dismissed the plaintiff's complaint and the Michigan Court of Appeals affirmed finding that the defendant's actions were not sufficiently extreme and outrageous to constitute the tort of intentional infliction of emotional distress.

■ In the instant case, the only facts upon which Plaintiffs base their claim of in-

had attempted to remove supervisory employees from the bargaining unit and discontinue paying pension fund payments on their behalf. A labor strike ensued. During the strike, the Teamsters threatened supervisory employees that they would lose their pension fund rights if they crossed the union picket line. The union also threatened to shut Domestic down unless Domestic continued to make pension fund contributions on the supervisory employees' behalf. On the union's 12(b)(6) motion to dismiss filed as their initial responsive pleading, Judge Cohn held that

the plaintiff had stated a colorable RICO and Hobbs Act claim because the defendants' threats constituted illegal concerted activities under the LMRA. He found that factual disputes concerning the defendants' actions during the strike existed and, therefore, determined that resolution of the matter "must await summary judgment or a full trial on the merits." *Id.* at 1479.

Unlike *Domestic Linen,* in this case, there is no predicate "illegal" threat. As the *Harris* court explained, "Illegality is the foundation" of an extortion claim. 355 S.E.2d at 842.

tentional infliction of emotional distress are that (1) they were threatened with a lawsuit and with being reported to regulatory authorities and (2) they were promised that legal proceedings would "financially ruin" Dupuis personally and in his business. With respect to the threats of a lawsuit and of reporting Plaintiffs' activities to regulatory authorities, Chase has done no more than rely upon its legal rights. As for the threats of financial ruin, these are not sufficiently "extreme and outrageous" to sustain a claim of intentional infliction of emotional distress.

For the foregoing reasons, Count III of Plaintiffs' Complaint will be dismissed.

## 5. *PLAINTIFFS' CLAIM FOR EXEMPLARY DAMAGES MUST FAIL FOR FAILURE TO DEMAND A RETRACTION BEFORE FILING SUIT.*

■ By virtue of the Court's rulings with respect to the merits of Plaintiffs' substantive counts, only Count I for defamation survives. In a defamation action, exemplary damages are allowed only if the plaintiff, "before instituting his or her action, gives notice to the defendant to publish a retraction and allows a reasonable time to do so." M.C.L. § 600.2911(2)(b). Mark Dupuis admitted in his deposition that no retraction demand was ever given. [Dupuis Dep.Tr. p. 84.] Therefore, Plaintiffs will not be entitled to exemplary damages.

In sum, the Court will GRANT Defendant's Motion for Summary Judgment and dismiss Counts II, III, IV, and V of Plaintiffs' Complaint. Count I will proceed to trial.

## C. *THIRD–PARTY DEFENDANTS' MOTIONS FOR DISMISSAL OR SUMMARY JUDGMENT ON CHASE'S THIRD–PARTY CLAIMS*

Two separate Motions for Summary Judgment on Chase's Counterclaim and Third–Party Claim have been filed by Third–Party Defendants: One motion has been filed by LFB and a second motion has been filed by M & M Management and its employees Fer-

rell Travis Riley, Frank Riley, and Treva Shay (collectively referred to as the "M & M parties"), each motion seeking dismissal of the counts in the Counterclaim and Third–Party Claim directed at the respective parties. Thus, LFB seeks dismissal of Count I (breach of insurance policy); Count VII (conversion); and Count IX (conspiracy/concert of action). The M & M parties also seek dismissal of the conspiracy count, Count IX.

In seeking dismissal/summary judgment, LFB and the M & M parties advance four arguments. First, both LFB and the M & M parties contend that the third-party claims alleged by Chase are not proper third-party claims under Fed.R.Civ.Pro. 14(a), and, therefore, must be dismissed.

Alternatively, LFB argues that its refund of only part of the premium was in compliance with the terms of the policy, and therefore, Chase has failed to state a cognizable claim in Count I (for breach of the policy), Count VII (for conversion based on LFB's failure to refund the full pro-rata amount of the premium) and Count IX (for conspiracy to mislead Chase and in facilitating LFB's conversion of the unreturned premium amount).

The M & M parties argue, as an alternative to dismissal under Rule 14(a), that Chase's Count IX for conspiracy/concert of action to commit various torts (i.e., the misrepresentation, fraud and conversion claims alleged in Counts IV–VII) is not pled with sufficient specificity in compliance with Fed.R.Civ.Pro. 9(b), and therefore, must be dismissed.[13]

## 1. *THERE IS NO MERIT IN THIRD–PARTIES RULE 14(a) ARGUMENT*

■ Both LFB's and M & M's principal argument for dismissal of Chase's third-party claims against them is that they are not proper "third-parties" under Fed.R.Civ.Pro. 14(a). According to LFB and M & M, a third-party may only be brought into an action by the defendant if he "is or may be liable to the [defendant] for all or part of the

---

**13.** The M & M parties also have advanced an argument for dismissal of Chase's breach of insurance policy claim. However, this claim is not asserted against M & M; it is only asserted against LFB.

plaintiff's claim against the [defendant]." In other words, under LFB's and M & M's theory, only if Chase were seeking contribution from them for VMI's claims against Chase for defamation, extortion, intentional infliction of emotional distress, etc. could they be made parties to this lawsuit.

As Defendant points out, this narrow construction of the Federal Rules of Civil Procedure ignores the fact that both Rules 13 and 20 clearly authorize Chase's action in asserting its "third-party" claims in this case. Fed.R.Civ.Pro. 13(h) provides that *"Persons other than those made parties to the original action may be made parties to a counterclaim* or cross-claim in accordance with the provisions of Rules 19 and 20." Rule 20 permits the joinder of persons against whom a right to relief is asserted "in respect of or arising out of the same transaction, occurrence or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action."

As the Sixth Circuit explained in reversing a dismissal of a third-party complaint in *Lasa Per L'Industria Del Marmo Societa Per Azioni v. Alexander,* 414 F.2d 143 (6th Cir. 1969),

> Under the Federal Rules of Civil Procedure the rights of all parties generally should be adjudicated in one action. Rules 13 and 14 are remedial and are construed liberally. Both Rules 13 and 14 are "intended to avoid circuit of action and to dispose of the entire subject matter arising from one set of facts in one action, thus administering complete and evenhanded justice expeditiously and economically." *Blair v. Cleveland Twist Drill Co.,* 197 F.2d 842, 845 (7th Cir. [1952] ). The aim of these rules "is facilitation not frustration of decisions on the merits." *Frommeyer v. L. & R. Construction Co.,* 139 F.Supp. 579, 585 (D.N.J. [1956] )

*Id.* at 146. *See also, F.D.I.C. v. Bathgate,* 27 F.3d 850, 873–74 (3d Cir.1994) (holding that defendants' pleading did not qualify as a third-party complaint under Rule 14(a) but that the parties sued were properly joined as

"additional parties to the counterclaim pursuant to Rule 13(h)").

As the Third Circuit explained in *Bathgate,* so long as at least one party against whom a counterclaim/third-party claim is asserted was a. party to the original action, counterclaims may be asserted against additional third parties:

> Rule 13(h) only authorizes the court to join additional persons in order to adjudicate a counterclaim or cross-claim that is already . before the court *or one that is being asserted at the same time the addition of a nonparty is sought.* This means that a counterclaim or cross-claim may not be directed solely against persons who are not already parties to the original action, but must involve at least one existing party. C.A. Wright, A. Miller, M.K. Kane, *Federal Practice and .Procedure,* Vol. 6, § 1435, at 270–71. . . . [A]t the same time that the pleading against the Bank directors was filed, the Bathgate defendants' counterclaims against the [Plaintiff] remained before the district court. thus, the Bathgate defendants properly joined the Bank directors as additional parties to the counterclaim pursuant to Rule 13(h). . . .

27 F.3d at 873–74.

In this case, Chase's Third–Party Claims against LFB, the M & M parties, and the Gaelic Union parties were asserted at the same time—indeed, in the same pleading—as its counterclaim against VMI and Dupuis, the Plaintiffs in the principal action. Having been asserted at the same time as claims against "at least one existing party", the claims against additional parties LFB, M & M, the Rileys, Travis Shay, Gaelic Union and Dominique Testu, were properly asserted.

The foregoing makes clear that, although perhaps unartfully captioned, Chase's "third-party" claims comply with the Federal Rules of Civil Procedure. Accordingly, to the extent that LFB and the M & M parties seek dismissal based upon Chase's purported non-compliance with Rule 14(a), their Motions for Summary Judgment will be denied.[14]

---

**14.** To the extent that dismissal is sought because Chase did not seek first leave of the Court to add additional parties before filing and serving its

"Counterclaim and Third–Party Claim", .the moving Third–Parties have not been prejudiced by Chase's failure to do so.

2. *SIMILARLY, THERE IS NO MERIT IN M & M'S ARGUMENT THAT DISMISSAL OF COUNT IX IS REQUIRED UNDER FED.R.CIV.PRO. 9(b)*

■ M & M also argues for ·dismissal of Count IX, which is the claim against all of the third-party defendants for conspiracy/concert of action with VMI and Mark Dupuis. Count IX alleges:

> 94. Third-party defendants acted tortiously and in concert and/or conspiracy with counterdefendants pursuant to a common plan or design *to mislead Chase* into believing that reinsurance was in place that was not *and in converting Chase's funds*. `.

[Counterclaim and Third–Party Claim, ¶ 94.]

M & M contends that this allegation is not pled with sufficient specificity in compliance with Fed.R.Civ.Pro. 9(b), and therefore, must be dismissed. However, M & M overlooks the fact that in the paragraph immediately preceding this allegation Chase expressly "restates its allegations in paragraphs 1–57 and 70–88 as if fully set forth herein." [Counterclaim and Third–Party Claim ¶ 93.] The referenced paragraphs include the specific allegations of misrepresentation, fraud and conversion and set forth with more than adequate specificity the bases for Chase's allegations in paragraph 94 of Count IX. Therefore,. M & M's Motion for Summary Judgment will be denied.

3. *LFB'S COMPLIANCE WITH THE TERMS OF THE INSURANCE POLICY IS A DISPUTED FACTUAL MATTER, HENCE, SUMMARY JUDGMENT BASED UPON SUCH COMPLIANCE IS INAPPROPRIATE.*

LFB's final summary judgment argument is that it fully complied with the insurance policy in returning only $171,559.20 of the $751,339.40 requested by Chase. LFB contends that the terms of the policy permitted it to invoke a "short rate" penalty upon cancellation of the policy by Chase. Chase disputes LFB's right to apply a "short rate" penalty.

Although LFB has purportedly quoted portions of some policy provisions in its Brief, *no copy of the policy has ever been provided to the Court.* In any event, Chase contends that the understanding of the parties differ as to how such a short rate penalty would be computed and applied. This dispute is obviously at the heart of the refund issue. However, the Court cannot determine whether the policy terms are clear and unambiguous without having a copy of the policy before it.

■ Whether the terms of a contract are clear or ambiguous is a question of law for the court to decide. *See, Tennessee Consolidated Coal Co. v. United Mine Workers,* 416 F.2d 1192, 1198 (6th Cir.1969), *cert. denied,* 397 U.S. 964, 90 S.Ct. 999, 25 L.Ed.2d 256 (1970). Where there is clear and unambiguous language in an agreement, the intent of the parties is to be determined from those terms, without reference to extrinsic evidence. *See Steinmetz Elec. Contractors v. International Brotherhood of Electrical Workers,* 517 F.Supp. 428, 432 (E.D.Mich. 1981).

■ As then United States District Judge (now Michigan Supreme Court Justice) Patricia Boyle explained in *Steinmetz* in granting the defendants' motion for summary judgment in that case:

> If the [plain language of the] terms of a contract [is] clear and unambiguous, the intent of the parties is to be gleaned from those terms, without reference to asserted subjective understandings of the parties. *E.g., Kimbell Foods, Inc. v. Republic National Bank of Dallas,* 557 F.2d 491, 495–496 (5th Cir.1977), *aff'd sub nom United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979); *Hank v. Lamb,* 310 Mich. 81, 88, 16 N.W.2d 671 (1944). Thus, the fact that the parties may disagree as to the meaning of contract terms does not necessarily establish the existence ambiguity in a legal sense. Therefore, summary judgment may be appropriate in a case where the contract terms are clear and unambiguous, even if one party asserts that a result different from that embodied in the terms

was intended. *Freeman v. Continental Gin Co.*, 381 F.2d 459, 465 (5th Cir.1967).

517 F.Supp. at 432 (emphasis added).

While summary judgment may well be appropriate if there were no ambiguity in the policy, the Court cannot make such a determination on the record provided.

Therefore, LFB's Motion for Summary Judgment will be denied. If the evidence supports LFB's position at trial, LFB may seek a Rule 50 Judgment as a Matter of Law after the close of proofs.

### CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendant Chase's Motion for Summary Judgment is granted in part and denied in part. Summary judgment is GRANTED as to Counts II, III, IV and V, but DENIED as to Count I.

IT IS FURTHER ORDERED that the separate Motions for Summary Judgment filed by Third–Party Defendants LFB and M & M Management and its employees are hereby DENIED.

IT IS FURTHER ORDERED that the parties shall appear with counsel for a **Final Pre–Trial Conference** on ***Thursday, January 11, 1996 at 10:00 a.m.*** in the Chambers of the Honorable Gerald E. Rosen, U.S. District Judge, Theodore Levin U.S. Courthouse, Room 802, 231 W. Lafayette Blvd., Detroit, Michigan 48226. A **Joint Final Pre–Trial Order** shall be submitted to the Court no later than Monday, January 8, 1996.