STEINMETZ ELECTRICAL CONTRACTORS ASSOCIATION, Plaintiffs,

v.

LOCAL UNION NO. 58 INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, Defendants.

Civ. A. No. 78–73280.

United States District Court, E. D. Michigan, S. D.

June 24, 1981.

Anthony A. Asher, Julia A. Cardno, Southfield, Mich., for plaintiffs.

Donald J. Prebenda, Southfield, Mich., Rolland R. O'Hare, Detroit, Mich., for defendants.

## OPINION AND ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT

PATRICIA J. BOYLE, District Judge.

This litigation arises from a dispute between the Plaintiff and the union as to whether there exists a valid collective bargaining agreement to which they are parties. The trustees of the various fringe benefit funds are named in this action because they concluded that there was not a valid agreement and thus threatened to reject contributions from Plaintiff's members for members' employees, thereby precipitating this suit. Though the union was not originally party to this litigation, by stipula-

tion of the original parties, an order was entered restyling the case and adding the union as a defendant. The matter now is before the Court on motions for summary judgment by all the Defendants.

Steinmetz Electrical Contractors is a union-recognized employer association, which bargained a contract[1] covering residential, not commercial, electrical work. Amended Complaint, Exhibit B. In 1975 the negotiations culminated in a contract which was submitted to the International Union for approval but was rejected by the International for numerous reasons. *See* Union's Motion for Summary Judgment, Exhibit 1. Thereafter negotiations recommenced and a new agreement, significantly modified to meet the concerns raised by the International Union, was submitted to the International in 1976. Again, the International Union objected, specifying certain unacceptable areas in the revised contract. *See* Union's Motion for Summary Judgment, Exhibit 2. It is undisputed that further negotiations ceased and that no ratification of any agreement was forthcoming from the International Union.

■■■ The presence of a collective bargaining agreement is crucial because this action is brought under Section 301 of the Labor-Management Relations Act of 1947, as amended, 29 U.S.C. § 185, which is premised on the existence of a collective bargaining agreement. Although both Defendants challenge jurisdiction, they correctly style their attacks as motions for summary judgment. As stated by the Ninth Circuit:

> [W]hen a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiffs' substantive claim for relief, a motion to dismiss for lack of subject matter jurisdiction rather than for failure to state a claim is proper only when the allegations of the complaint are frivolous.

*Timberlane Lumber Co. v. Bank of America, N.T. & S.A.*, 549 F.2d 597, 602 (9th Cir. 1976) (citation omitted); *accord, Baker v. Fleet Maintenance, Inc.*, 409 F.2d 551, 553–54 (7th Cir. 1969); *see Lear Siegler, Inc. v. UAW*, 287 F.Supp. 692 (W.D.Mich.1968), *aff'd in pertinent part*, 419 F.2d 534 (6th Cir. 1969). Thus, while the motion is properly considered under summary judgment standards, the disputed question remains whether there is a collective bargaining agreement to support the allegations brought under Section 301.

The union and the trustees assert that no agreement was ever consummated because approval of a proposed agreement by the International was a condition precedent to its finalization and such approval never was obtained. The Plaintiff asserts that a binding agreement is in force and, in the alternative, that Defendants now are estopped to deny obligations set forth in the agreement to which the union and Plaintiff are signatory even though full approval by the International Union never materialized. Finally, Plaintiff contends, on a "carry-over" theory, that the predecessor collective bargaining agreement governs the relationship between the parties if they have not succeeded in negotiating a successor agreement.

The 1975 agreement included the following language below the signature lines:

> Subject to the approval of the International President of the International Brotherhood of Electrical Workers. Further, this Agreement is subject before effectiveness to presentation and ratification by members of Local 58, IBEW. Acceptance or rejection by said members shall be communicated to the Employer on or before the 19th day of October, 1975.

1975 Agreement at 25. The 1976 Agreement stated, in Article VII, "This agreement is subject to approval of the International President of the International Broth-

---

1. The terms "contract" and "agreement", as used in reference to the document negotiated between the local union and Steinmetz, shall not be understood, for purposes of this opinion, to refer to a legally binding contract or agreement since the legal effect of the writing is the issue central to the instant motion.

erhood of Electrical Workers." Because it is not disputed that neither agreement was approved by the International President, Defendants argue that there is no binding collective bargaining agreement, there having been a failure of a condition precedent.

Plaintiff, on the other hand, urges that an agreement, binding on the parties, does exist insofar as it covers matters that were not objected to by the International President. Essentially, Plaintiff says that the approval by the International was not a condition precedent. Plaintiff thus contends that there is a factual dispute as to the intent underlying the agreement, noting the affidavit of Mr. Anthony Asher, which says:

> It was my understanding that [Article VII] meant that the parties would renegotiate terms to which the International objected, but that the basic agreement would go into effect as of the day it was executed. The International did have objections to the agreement, and the parties attempted to meet these objections but were unable to do so.

Hence, Plaintiff asserts that a binding agreement is in force, subject only to deletions of those provisions not approved by the International Union.

■ Whether the terms of a contract are ambiguous is a question of law for the Court to determine. *Tennessee Consolidated Coal Co. v. United Mine Workers of America*, 416 F.2d 1192, 1198 (6th Cir. 1969), *cert. denied*, 397 U.S. 964, 90 S.Ct. 999, 25 L.Ed.2d 256 (1970); *Metropolitan Paving Co. v. City of Aurora*, 449 F.2d 177, 181 (10th Cir. 1971). *See generally*, 4 WILLISTON ON CONTRACTS § 601 at 303–315 (3d ed. 1961). If the terms of a contract are clear and unambiguous, the intent of the parties is to be gleaned from those terms, without reference to asserted subjective understandings of the parties. *E. g., Kimbell Foods, Inc. v. Republic National Bank of Dallas*, 557 F.2d 491, 495–96 (5th Cir. 1977), *aff'd sub. nom. United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979); *Hank v. Lamb*, 310 Mich. 81, 88, 16 N.W.2d 671 (1944). Thus,

the fact that the parties may disagree as to the meaning of contract terms does not necessarily establish the existence of ambiguity in a legal sense. Therefore, summary judgment may be appropriate in a case where the contract terms are clear and unambiguous, even if one party asserts that a result different from that embodied in the terms was intended. *Freeman v. Continental Gin Co.*, 381 F.2d 459, 465 (5th Cir. 1967).

■ In the instant case the contract terms recited above unambiguously provide that the agreement is subject to approval by the International President. Nowhere does any suggestion appear that the contract provisions, not objected to by the International President, should take binding effect independently of those provisions vetoed by the President. Under the principles of contract interpretation and construction discussed above, the only possible conclusion to be drawn from the language is that the contract was subject to approval by the International Union and that, absent such approval, no binding contract existed. It is difficult to conceive that either party would acquiesce to an arrangement by which the International President could, in effect, enforce only select provisions of an agreement which, by definition, is a composite of delicately balanced provisions conceived in the give-and-take of collective bargaining. Had the parties intended that failure of the International President to object to portions of the proposed contract would cause those provisions to take binding effect, it is only reasonable that the agreement would explicitly so state. Thus, despite the Plaintiff's argument that select provisions of the collective bargaining agreement are in force, because the clear and unambiguous language of the agreement imposes a condition that never was met, it must be concluded as a matter of law that there is no binding collective bargaining agreement in force between the union and Plaintiff.

■ Having concluded that the collective bargaining agreement on its face is not operative, the next consideration is Plaintiff's contention that the union is estopped to deny the existence of an agreement.

Facts sufficient to support any such claim have not been advanced, however. While the Plaintiff can assert that working conditions have been in accord with the requirements established in the agreements negotiated in 1975 and 1976, *see* Affidavit of Norman Harwood, March 27, 1981, that fact does not show any action on the part of the union that would estop the union to deny existence of a contract. In fact, the same affidavit states that no grievance ever has been filed by the union alleging a violation of the collective bargaining agreement, an averment that, if it shows anything, shows that the union does not perceive that a valid collective bargaining agreement exists through which grievance recourse can be taken. Moreover, the Plaintiff has been before the NLRB contending that the union has refused to bargain, a position inherently contradictory to an assertion that the union has behaved as if a contract is in effect. Absent factual allegations demonstrating specific action by the union consistent with the existence of the alleged collective bargaining agreement, *cf. Kelley-Nelson Construction Co. v. Construction and General Laborers' Union Local 107*, 80 LRRM 2334, 2338 (W.D.Ark.1972) (finding collective bargaining agreement absent actual execution in instance where contributions to fringe benefit funds had been made in accord with agreement *and* terms of agreement had been used to settle company-union dispute), it cannot be concluded that the union is bound by the alleged agreements of either 1975 or 1976.

█ Finally, I cannot accept the proposition that any pre-1975 agreement can supply a collective bargaining agreement or can satisfy the requirements of Section 302(c)(5) on a "carry-over" theory. With respect to this last point, it is true that the Tenth Circuit has given its imprimatur to the concept that an expired collective bargaining agreement will live on as a foundation for pension fund contributions made under the authority of Section 302(c)(5). *Denver Metropolitan Association of Plumbing, Heating, Cooling Contractors v. Journeyman Plumbers & Gas Fitters Local 3*, 586 F.2d 1367, 1373 (10th Cir. 1978). This general rule is eminently reasonable, but it does not resolve the case at bar because it is equally reasonable to assert that the expired agreement cannot have effect in perpetuity, either as a means of compelling continued employer contributions to a plan or as a foundation on which the plan may rely in accepting the contributions. No case is cited and the Court finds none establishing the outer limits to which an expired collective bargaining agreement can extend and remain vital as it relates to pension fund contributions made in accordance with Section 302(c)(5). For purposes of the instant case, however, it is enough to conclude simply that at this time, more than five years after a valid collective bargaining agreement last existed covering the employees of the Plaintiff's members, it can no longer be said that there is a written agreement pursuant to which fringe benefit fund contributions can be accepted or compelled. This situation cannot be described as one in which the parties are in a hiatus between collective bargaining agreements. Therefore, it is concluded that Plaintiff cannot rely on any collective bargaining agreement between the union and Plaintiff because under no theory can one be discovered.

With respect, specifically, to the Trustees, the issues are more complex. Putting to one side the question of what jurisdictional foundation exists in the absence of a collective bargaining agreement between Plaintiff and the union, the question is whether there is a writing sufficient to satisfy the requisites of Section 302(c)(5), 29 U.S.C. § 186(c)(5), and whether, if a sufficient writing is technically absent, it can be practically supplied through operation of an estoppel theory.

Initially, it is to be noted that the Trustees have made an administrative determination that there is no writing adequate to satisfy the requirements of Section 302(c)(5). At least in the context of an administrative decision denying pension benefits to an applicant, the courts have refused to upset the determination of fund trustees unless it is "arbitrary and capricious." *E. g., Reiherzer v. Shannon*, 581

F.2d 1266, 1272 (7th Cir. 1978); *cf. Hodgins v. Central States Southeast and Southwest Areas Pension Fund*, 624 F.2d 760, 762 (6th Cir. 1980) (affirming district court decision applying "arbitrary and capricious" standard, citing *Reiherzer* with approval but articulating standard as "inherently inconsistent," omitting reference to "arbitrary and capricious"). These and similar cases deal, however, with issues relating to decisions interpreting a pension applicant's eligibility under the terms of the pension plan, a document the trustees are best situated to interpret. It is not clear that similar deference to the decision of the trustees is required where, as here, the sole issue is a legal dispute as to whether a written agreement adequate for Section 302(c)(5) purposes exists. *Cf. Local 5, Sheetmetal Workers' International Ass'n v. Mahoning and Trumbull County Building Trades Welfare Fund*, 541 F.2d 636, 639 (6th Cir. 1976) (arbitrary and capricious standard might not independently resolve review of trustee decision challenged as violative of statutory "sole & exclusive benefit," 29 U.S.C. § 186(c)(5), requirement); *Denver Metropolitan Association of Plumbing, Heating, Cooling Contractors v. Journeyman Plumbers & Gas Fitters Local 3*, 586 F.2d 1367, 1372–73 (10th Cir. 1978) (issue of existence of written agreement dealt with by court without reference to any deference owed to implicit determination of trustees that written agreement existed). Thus, without expressing a final opinion on the question, for purposes of this case the analysis will proceed on the understanding that the trustees are not aided by any special deference to their determination that there is not a written agreement adequate to satisfy the demands of Section 302(c)(5).

■ It is not necessary that the written agreement be in the form of a collective bargaining agreement. *Doyle v. Shortman*, 311 F.Supp. 187, 193–96 (S.D.N.Y.1970); *see Hinson v. NLRB*, 428 F.2d 133, 139 (8th Cir. 1970). In *Doyle* the court ruled that the payments of contributions coupled with the submission of signed remittance reports filed with the funds were adequate to manifest adoption of the pension plan by non-

union, nonsignatory employer contributors. This liberal reading of the "written agreement" requirement rested largely on the court's view that the congressional goal of promoting industry-wide pension and welfare funds would be promoted by a liberal construction of the requirement.

*Doyle v. Shortman* is an example of a case in which the court strained to find a route by which to bypass the technical pitfalls that would prevent the plaintiff from receiving a reasonably anticipated pension. Other courts have been less inclined toward so relaxed an approach, despite the hardship that is imposed when an employee's pension expectation is dashed because no written agreement existed. For example, the Second Circuit, in *Moglia v. Geoghegan*, 403 F.2d 110 (2d Cir. 1968), *cert. denied*, 394 U.S. 919, 89 S.Ct. 1193, 22 L.Ed.2d 453 (1969), referring to the trustees' practice of accepting employer contributions not made pursuant to a written agreement, said:

> This practice has caused needless hardship in this case and could cause hardship in other cases involving innocent employees. Those engaged in the future in such lackadaisical adherence to the mandates of Section 302 should bear in mind that Congress has provided appropriate penalties for those who take too lightly the requirements of that section.

403 F.2d at 119 n.7.

The equities strongly favor plaintiffs in cases like *Doyle* and *Moglia*. Yet in the latter case, the court still would not strain to find a writing. In the instant case, we are not presented with a circumstance where, after a lifetime of employment and after attempting to obtain a justifiably expected pension, an employee or group of employees learns that the pension is not to be forthcoming. Rather, the trustees at bar have, it would appear, taken notice of the *Moglia* precedent and have undertaken to assure that future pension applicants are not suddenly denied retirement income because the trustees failed, at an earlier time, to determine whether or not the statutory prerequisites to receipt of pension contributions had been satisfied.

■ In this circumstance especially, it would appear that a circumspect approach to the written agreement requirement is preferred. As demonstrated by the analysis in *Moglia v. Geoghegan*, the statutory history can be marshalled in support of an approach that will prevent "[a]ny erosion of the strict requirements of [Section 302(c)(5)] . . . ." 403 F.2d at 116. It would be unwise to strain to find a written agreement sufficient for Section 302(c)(5) purposes only to have employees covered by the perceived written agreement subsequently learn, to their much greater detriment, that this Court's analysis could not withstand later scrutiny by this or another court. Thus, without expressing an opinion on whether a more lenient approach would be mandated by the equities, were this a circumstance involving actual denial of a pension to an applicant on whose behalf contributions had been made during his or her working life, for purposes of this case, adherence to the rationale evidenced in cases like *Moglia* is required.[2]

In the instant case the Plaintiff disclaims any intent to adopt the pension plan in existence between the National Electrical Contractors Association ("NECA") and the union. In *Doyle* it was such an approach that convinced the court that plaintiff was covered by an agreement. There the court agreed that the employer associations had bargained an industry-wide pension plan covering union and nonunion employees alike, which was adopted by nonunion employers who made contributions to the plan and signed remittance reports. The Plaintiff at bar eschews any suggestion that it has embraced the NECA/Electrical Workers agreement, arguing instead that the Steinmetz/Electrical Workers agreement suffices as a written agreement. Therefore, though it would appear that *Doyle* is otherwise distinct,[3] the Court is not confronted with a question of whether the NECA/Electrical Workers agreement satisfies the requisites of Section 302(c)(5) with respect to the Plaintiff's members' contributions.

■ Having concluded that there is no agreement in force between the parties, I must consider whether Plaintiff can successfully invoke an estoppel argument against the trustees on the basis of past acceptance by them of Plaintiff's members' contributions. In the circumstance of an employee claiming a right to a pension, the courts have been generally unreceptive to attempts to invoke an estoppel approach against trust funds where the effect would be to require the trustees to violate a legal obligation. *E. g., Thurber v. Western Conference of Teamsters Pension Plan*, 542 F.2d 1106, 1108–09 (9th Cir. 1976) (per curiam); *Dohrer v. Wakeman*, 14 Wash.App. 157, 539 P.2d 91, 90 LRRM 2674, 2677 (1975). Where there is not a written agreement, the trustees could legally accept contributions only if an agreement itself could be imposed by operation of estoppel, an approach the courts will not countenance. *Moglia v. Geoghegan*, 403 F.2d at 117. Thus, even where an estoppel argument in favor of a pension claimant has been recognized, it has been noted: "The estoppel is not used to supply a missing ingredient, such as a written agreement, required by statute. *Compare Moglia v. Geoghegan* . . . . Rather, the estoppel only defines a fiduciary duty which the Fund owes to its beneficiaries in the administration of the written pension agreement." *Hodgins v. Central States Southeast and Southwest Areas Pension Fund*, 624 F.2d 760, 764 (6th Cir. 1980) (Jones, J., concurring).

Based on the foregoing discussion, it is concluded that there is not an existing written agreement between the Plaintiff and

---

**2.** Similarly, no opinion is expressed as to the ultimate right of employees, whose employer contributions are in issue here, to receive credit for contributions made before and during the pendency of this suit.

**3.** In *Doyle* it appears that the nonunion employers were nonetheless members of the employer associations that were signatories to the trust agreements and pension plan. In contrast Plaintiff at bar does not suggest that it, on behalf of its membership, is in some way signatory to the plans administered by the trustee Defendants.

the union pursuant to which contributions are to be made to the fund and there is no legal basis for the Plaintiff's estoppel claim, either against the union or the trustees.

■ In sum, it is concluded that the trustee Defendants correctly determined that they should question the validity of contributions being made pursuant to the alleged collective bargaining agreement between Plaintiff and the union. They were reasonable in doing so, both because they were correct and because the spectre of personal liability raised in no uncertain terms by the court in *Moglia v. Geoghegan,* 403 F.2d at 119 & n.7, counsels caution by trustees assuming the sufficiency of attempted compliance with Section 302(c)(5).

Because there is not a writing within the meaning of Section 302(c)(5) and because no estoppel argument can prevail, the Defendant trustees' motion for summary judgment must be GRANTED. In the amended complaint, jurisdiction is invoked entirely under Section 301, 29 U.S.C. § 185, which is premised on a collective bargaining agreement not found here. But even if jurisdiction is assumed, the rationale set forth in the foregoing discussion mandates dismissal of the claims against the trustees.

The motion of the Defendant union for summary judgment also must be granted. As explained above, there is not a binding collective bargaining agreement in effect between the union and the Plaintiff. So, as a threshold matter, jurisdiction against the union is lacking. Again pursuing the question beyond the jurisdictional stage for the sake of argument, the Plaintiff's allegation that the union breached the collective bargaining agreement is without merit.

In the absence of a collective bargaining agreement, it cannot be asserted that the notification of the union to the trustees that there is no agreement is a violation of any contractual obligation. *See* Amended Complaint, paragraph 10. It is suggested that the union remained bound under the 1975 NECA/Electrical Workers Contract, which provided that existing provisions of the contract remain in effect "until a conclusion is reached in the matter of proposed changes." Article 1 Section 2(C) of Southeastern Michigan Chapter NECA and Local Union No. 58, IBEW ARTICLES of AGREEMENT and WORKING RULES. Yet the Plaintiff steadfastly maintains that it has been following not the 1975 NECA/Electrical Workers Contract provisions but rather those of the purported Steinmetz/Electrical Workers Contract. Furthermore, as already has been observed in connection with the argument that there is a "carry-over" obligation, it is inconceivable that the obligation could continue indefinitely. The contract itself speaks of a carry-over "until a conclusion is reached." There is no reason to believe that the "conclusion" necessarily is a new contract. It rather would refer to a conclusion of negotiations aimed at but not necessarily achieving a new contract. Again, it is not necessary to formulate an objective rule as to the time at which negotiations can be viewed as "concluded." It is sufficient to find on the facts of this case that the 1975 NECA/Electrical Workers Contract is without continuing effect.

■ To the extent that Plaintiff can be understood to allege improper actions by the union going beyond a specific violation of the collective bargaining agreement, the claims are properly the subject of National Labor Relations Board inquiry. Though it cannot be disputed that the courts and the Board have concurrent jurisdiction over claims that result from alleged actions that are both contract violations and unfair labor practices, *e. g., Smith v. Evening News Association,* 371 U.S. 195, 197, 83 S.Ct. 267, 268, 9 L.Ed.2d 246 (1962), when the matter in dispute is not an issue under a contract, then the courts are without jurisdiction. The only specific allegation of a contract violation by the union is the claim that the union breached the purported contract by telling the trustees that there was not a collective bargaining agreement in force between it and Plaintiff.

Based on these conclusions, the union's Motion for Summary Judgment is GRANTED.

Motions for summary judgment having been granted in favor of all Defendants, it is necessary to address the issue of the pending preliminary injunction requiring the funds to accept contributions from the Plaintiff's members. Fairness dictates that reasonable notice of the anticipated refusal to accept contributions be given to the employers and to the affected employees. Therefore, the trustees are directed to provide notice of their intended action to the employers and employees and to continue to receive contributions under the existing injunction for a period of sixty (60) days from the date of receipt of this order.[4]

IT IS SO ORDERED.