72 F.3d 130
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNION OIL COMPANY OF CALIFORNIA, a California Corporation
d/b/a UNOCAL, Plaintiff-Appellee,
v.
PROFESSIONAL REALTY INVESTMENTS, INC., a Michigan
Corporation, Defendant-Appellant.
 No. 94-2021.
 United States Court of Appeals, Sixth Circuit.
 Dec. 5, 1995.
 
 Before: CONTIE, MILBURN, and NORRIS, Circuit Judges.
 MILBURN, Circuit Judge.
 
 
 1
 Defendant and counterplaintiff Professional Realty Investments, Inc. ("PRI"), a Michigan corporation, appeals the district court's summary judgments for Union Oil Company of California ("Unocal"), a California corporation, and also the denial of its motion to amend its countercomplaint, in this diversity action under Michigan law relating to a contract for the remediation of environmental contamination of real property. On appeal, the issues are (1) whether the district court erred in granting summary judgment to Unocal on PRI's counterclaim for breach of contract, (2) whether the district court erred in granting summary judgment to Unocal on PRI's counterclaim for negligence, (3) whether the district court erred in granting summary judgment to Unocal on PRI's counterclaim for continuing trespass, and (4) whether the district court abused its discretion in denying PRI's motion to amend its countercomplaint. For the reasons that follow, we affirm.
 
 I.
 A.
 
 2
 For several years, The Pure Oil Company owned and operated a gasoline service station at 33604 Grand River Avenue, Farmington, Michigan, but it ceased its gas station operations in 1967. Plaintiff and counterdefendant Unocal is a successor in interest to The Pure Oil Company. On September 4, 1970, the Grand River Avenue property was sold to Lawrence and Corrine Mayer who used the property to operate a floral shop. The Mayers knew that there were some underground storage tanks ("USTs") on the property, but they did not know that there were seven USTs. On March 29, 1983, the Mayers sold the property to Michael and Sandra Taylor who transferred their interest to PRI, a company in which the Taylors maintained stock control. Eventually, Thomas DeWard acquired all of the Taylors' stock interest in PRI and became the owner of the property. PRI was allegedly unaware of the existence of the USTs.
 
 
 3
 In 1989, as the City of Farmington was trying to locate a water line on the property, the possible existence of the USTs was discovered. This was confirmed in May of 1990 when seven USTs were located and removed from the property, rendering the property useless for over a year and a half as the decontamination process continued. After the discovery of the USTs, PRI contacted Unocal and requested that Unocal provide the necessary funding to remove the USTs and remediate the property. On December 3, 1990, the parties signed the following letter agreement:
 
 
 4
 Unocal will assume financial responsibility for the further investigation, tank removal, any repairs as a result of remediation activities, and necessary remediation of the property at 33604 Grand River Avenue, Farmington, Michigan. From this date forward, any funds [PRI] receive[s] from the MUSTFA for the additional investigation, removal and potential remediation activities will be reimbursed to Unocal.
 
 
 5
 J.A. 34. In carrying out this agreement, PRI supervised all of the remediation activities, acting essentially as a general contractor, and forwarded the invoices to Unocal for payment. As PRI submitted claims and received funds through the Michigan Underground Storage Tank Financial Assurance Act ("MUSTFA"), Mich.Comp.Laws 299.801 et seq., it would forward the funds to Unocal.
 
 
 6
 On November 15, 1991, PRI sold the Grand River Avenue property to Patrick and Wendy Acres. On December 2, 1991, PRI sent Unocal an invoice of $206,766 for PRI's expenses in overseeing the remediation, for expenses in processing the MUSTFA claims, and for loss of interest and loss of value. Unocal refused to pay this invoice and argued that the letter agreement did not contemplate these expenses and only contemplated remediation expenses. Up to this time, Unocal had paid all the invoices which totalled $516,817.26. Unocal asserts that PRI had received $441,862.86 in MUSTFA funds but only forwarded $304,434.91 to Unocal. However, PRI asserts that it had only received $432,615.44 in MUSTFA funds and had reimbursed Unocal $327,189.26.
 
 
 7
 On January 6, 1993, the Michigan Department of Natural Resources ("MDNR") denied a Type A or Type B closure on the property. However, on June 7, 1993, the MDNR issued a Type B closure on the property, which ended any further remediation duties by PRI.
 
 B.
 
 8
 On October 16, 1992, Unocal filed an action against PRI and Thomas DeWard, the president of PRI, making claims for (1) breach of contract, (2) specific performance, (3) conversion, and (4) unjust enrichment. Unocal sought $137,427.95, the total of the MUSTFA funds that it alleges PRI withheld. On November 30, 1992, PRI and DeWard filed a countercomplaint making claims for (1) negligence, (2) breach of contract, (3) continuing nuisance, (4) nuisance per se, and (5) continuing trespass.
 
 
 9
 On November 8, 1993, the district court dismissed, for failure to state a claim, PRI's counterclaims of negligence, continuing nuisance, and nuisance per se. Also on that day, the district court granted summary judgment to Unocal for breach of contract, finding PRI liable for $137,427.95. PRI filed a motion for reconsideration, and on December 3, 1993, the district court reinstated PRI's counterclaim for negligence. Pursuant to a stipulation entered on November 18, 1993, Thomas DeWard was dismissed as a defendant.
 
 
 10
 The trial was set for December 20, 1993. However, on December 7, 1993, the district court granted Unocal's motion for leave to file an additional summary judgment motion. On March 8, 1994, the district court dismissed by summary judgment all remaining claims in both the complaint and countercomplaint. Thus, the district court dismissed Unocal's claims of specific performance, conversion, and unjust enrichment and PRI's counterclaims of negligence, breach of contract, and continuing trespass. However, on March 9, 1994, in ruling on PRI's motion for reconsideration, the district court reinstated PRI's counterclaim for continuing trespass only to dismiss it by summary judgment in the same order.
 
 
 11
 The district court issued a certificate of final judgment on August 29, 1994. This timely appeal by PRI followed.
 
 II.
 A.
 
 12
 Defendant PRI argues that the district court erred in granting summary judgment to Unocal on PRI's counterclaim for breach of contract. We review grants of summary judgment de novo. Brooks v. Am. Broadcasting Cos., 932 F.2d 495, 500 (6th Cir.1991). Summary judgment is appropriate when the "pleadings, depositions, ... together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir.1993); Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir.1988). Disputed facts will only prevent summary judgment when those disputes might affect the disposition of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In a summary judgment motion, the function of the court is not to weigh the facts but rather to determine if there is a genuine issue for trial. 60 Ivy Street Corp. v. Alexander, 822 F.2d 1432, 1435-36 (6th Cir.1987).
 
 
 13
 In reviewing a summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold Inc., 369 U.S. 654, 655 (1962) (per curiam)). However, when the motion is supported by documentary proof, such as depositions or affidavits, the nonmoving party may not rest upon her pleadings but must present some " 'specific facts showing that there is a genuine issue for trial'." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56(e)). These facts must be more than a scintilla of evidence and must meet the standard of "whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict...." Anderson, 477 U.S. at 252.
 
 
 14
 First, PRI argues that the district court improperly converted plaintiff Unocal's Federal Rule of Civil Procedure ("Fed.R.Civ.P.") 12(b)(6) motion to dismiss PRI's counterclaim for breach of contract into a motion for summary judgment under Fed.R.Civ.P. 56. When Unocal filed its "motion to dismiss counterclaim or alternatively for summary disposition of dismissal of counterclaim" on August 17, 1993, it only argued for a Fed.R.Civ.P. 12(b)(6) dismissal of PRI's counterclaim for breach of contract and did not rely on any evidence outside the pleadings. Thus, when PRI responded to Unocal's motion on September 17, 1993, it responded only in the context of Fed.R.Civ.P. 12(b)(6) and did not submit any additional evidence. However, when Unocal submitted its reply brief on September 27, 1993, it argued for dismissal of PRI's counterclaim for breach of contract based on Fed.R.Civ.P. 56 and submitted the affidavit of Lois Hague in support. On November 8, 1993, the district court granted summary judgment to Unocal under Fed.R.Civ.P. 56 with respect to PRI's counterclaim for breach of contract.
 
 
 15
 PRI argues that the district court's conversion of Unocal's Fed.R.Civ.P. 12(b)(6) motion to a Fed.R.Civ.P. 56 motion deprived PRI of "a reasonable opportunity to present factual evidence pertinent to such a motion." Appellant's brief at 7. In response, Unocal argues that PRI was put on notice by the title of Unocal's motion as one for dismissal or summary judgment or, alternatively, by the content of its reply brief and the affidavit of Hague.
 
 
 16
 When conversion occurs, Fed.R.Civ.P. 12(b) requires that "all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." In Dayco Corp. v. Goodyear Tire & Rubber Co., 523 F.2d 389, 393 (6th Cir.1975), we held that "[w]hether notice of conversion is required or not depends on the facts and circumstances of each case. Where one party is likely to be surprised by the proceedings, notice is required." We have further held that "a party cannot raise for the first time on appeal an argument that she was surprised by the conversion of the motion to dismiss into a motion for summary judgment when the party was aware that materials outside the pleading had been submitted to the court before the court granted the motion." Song v. City of Elyria, 985 F.2d 840, 842 (6th Cir.1993).
 
 
 17
 In the present case, Unocal's reply brief put PRI on actual notice of the affidavit of Hague filed outside the pleadings and of Unocal's intention to submit its motion under Fed.R.Civ.P. 56, but PRI argues that a reply brief is not adequate notice since new issues may not be raised in a reply brief. Although PRI relies on Wright v. Holbrook, 794 F.2d 1152, 1156 (6th Cir.1986), we held in that case that new issues on appeal could not be raised for the first time in a reply brief. Here, however, the issue is whether PRI had reasonable notice of the conversion of Unocal's motion to dismiss in the district court. PRI admits it was aware that the Hague affidavit had been submitted to the district court, and six weeks elapsed between the filing of the affidavit and the issuance of the district court's summary judgment. The fact that PRI's notice came in the form of Unocal's reply brief does not excuse PRI from failing to raise the conversion issue in the district court. PRI did not mention conversion in its motion for reconsideration filed on November 17, 1993. Thus, we conclude, based on this court's holding in Song v. City of Elyria, that PRI had adequate notice and opportunity to either raise the issue of conversion in the district court or submit an appropriate evidentiary response to it. See also Wright, 794 F.2d at 1157 (stating that a seven week span should be adequate notice and opportunity for a party to file additional materials when conversion occurs).
 
 
 18
 Second, PRI argues that the district court erred in finding that there was no genuine issue of material fact. PRI alleges that Unocal breached their contract by not paying the December 2, 1991 invoice of $206,766 and by refusing to pay for further remediation to the property. As earlier stated, the December 2 invoice was for PRI's loss of interest, loss of value, personal time in overseeing the remediation, and expenses in processing the MUSTFA claims. The district court concluded that the contract between PRI and Unocal was unambiguous and did not encompass the expenses sought in the December 2, 1991 invoice. Specifically, the district court found that the plain language of the letter agreement provided only that Unocal pay for costs related to "necessary remediation" and did not include the expenses in the December 2 invoice.
 
 
 19
 Regarding PRI's claims for further remediation expenses, PRI did not submit invoices for these alleged expenses to Unocal, explaining the failure to do so was due to the fact that Unocal had informed PRI in a letter that it had concluded that "further soil removal or testing is [not] necessary." J.A. 253. PRI asserts that it concluded that submitting invoices after that July 12, 1991 letter would be futile (even though they submitted the December 2, 1991 invoice after that date). Rejecting this claim of futility, the district court found that since PRI presented no evidence of alleged additional expenses, such as invoices, PRI had no evidence to support a breach of contract claim. The district court stated that PRI's "subjective belief that it would have been a waste of time to submit additional invoices does not amount to a breach by UNOCAL. UNOCAL should have been given an opportunity to act or refuse to act." J.A. 302. In making this ruling, the district court also relied on "the uncontroverted affidavit of Lois L. Hague" which stated that Unocal had paid all invoices submitted regarding remediation. J.A. 291.
 
 
 20
 PRI argues that the letter agreement is ambiguous, making summary judgment inappropriate. On the other hand, Unocal argues that there is no ambiguity present in the letter agreement. "Whether the terms of a contract are ambiguous is a question of law for the Court to determine." Seinmetz Elec. Contractors Assoc. v. Local Union No. 58 Int'l Bhd. of Elec. Workers, AFL-CIO, 517 F.Supp. 428, 432 (E.D.Mich.1981). If a contract is determined to be unambiguous, the court determines the construction of the unambiguous language. Soderburg v. Detroit Bank & Trust Co., 337 N.W.2d 364, 368 (Mich.App.1983). However, if a contract is determined to be ambiguous, then it is a question for the factfinder as to the meaning of the contract. Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 363 (3d Cir.1987) (construing Michigan law).
 
 
 21
 In interpreting a contract's meaning, Michigan law requires the court to examine all the circumstances surrounding the contract as well as all proffered evidence. Id. "If a contract, though inartfully worded or clumsily arranged, fairly admits of but one interpretation, it may not be said to be ambiguous or fatally unclear." Allstate Ins. Co. v. Goldwater, 415 N.W.2d 2, 4 (Mich.App.1987) (per curiam). If, after examining the evidence, the court determines that the contract "may reasonably admit of different meanings," then the contract is ambiguous. Tigg Corp., 822 F.2d at 363.
 
 
 22
 In the present case, the relevant language in the letter agreement is Unocal's promise to "assume financial responsibility for further investigation, tank removal, any repairs as a result of remediation activities, and necessary remediation of the property." J.A. 34. The costs contained in the December 2, 1991 invoice do not fit into any of those categories as they are incidental, overhead costs not contemplated by the plain language of the letter agreement. PRI presents no persuasive evidence that "necessary remediation" should be read beyond its plain meaning to include these costs. If the expenses included in the December 2, 1991 invoice were to be included in the agreement between PRI and Unocal, they could have been provided for in the letter agreement, but that agreement only refers to clean-up activities and makes no reference whatsoever to the types of expenses sought by PRI in its December 2, 1991 invoice.
 
 
 23
 While it is true that the last sentence of the letter agreement[1] preserves all of PRI's claims against Unocal, that does not mean, as PRI suggests, that the expenses included in the December 2, 1991 invoice are covered by the letter agreement. Instead, PRI must pursue some other theory of liability rather than breach of contract to recover these costs. The expenses on the December 2, 1991 invoice are more similar to incidental and consequential damages sought in a lawsuit and are not representative of expenses intended to be recoverable based on the reasonable interpretation of the letter agreement. In agreeing to be financially responsible for the remediation of the property, Unocal did not admit to any liability, and no finding of liability has ever been made. Accordingly, the district court was correct in finding that the expenses included in the December 2, 1991 invoice are not recoverable under the plain language of the letter agreement.
 
 
 24
 Regarding the expenses for further remediation which were never presented in invoices to Unocal, the district court was also correct in granting summary judgment to Unocal. A party must respond to a summary judgment motion by presenting "specific facts" establishing that there is a genuine issue of material fact. Celotex Corp., 477 U.S. at 324. PRI did not present specific facts to support its claim that Unocal was liable for further remediation to the property. Indeed, PRI presented no evidence establishing that further remediation activity took place on the property after Unocal had paid the last invoice for remediation activities. The only evidence PRI can point to is the general statement in DeWard's affidavit that Unocal owes for further remediation and the inference to be drawn from the MDNR's denial of a Type B closure in January of 1993. The mere fact that the MDNR denied a Type B closure and then later granted it only gives the vaguest inference that further remediation occurred, but that inference is even contradicted by the fact that the property had been sold, that the parking lots had been repaved, and that a building was reconstructed prior to the MDNR's denial of the request for a Type B closure. In any event, the MDNR denial is not a sufficiently specific fact to withstand PRI's evidentiary burden in responding to a summary judgment motion. See id. Based on the evidence presented to the district court, there is no genuine issue of material fact since facts were simply not submitted to the district court. Even if PRI were correct in claiming that submitting additional invoices to Unocal would be futile, that is not an excuse for PRI's failure to submit to the district court any facts supporting its claims of further remediation expenses. Accordingly, the district court was correct in deciding that there was no genuine issue of material fact and in granting Unocal's motion for summary judgment on PRI's counterclaim for breach of contract.[2]
 
 B.
 
 25
 PRI argues that the district court improperly granted summary judgment to Unocal on PRI's counterclaim for negligence. PRI asserts that "[t]he primary thrust of [its] [c]ounter-complaint for negligence was founded on Act No. 207 of the Public Acts of 1941 being Sections 29.1 to 29.33 of the Michigan compiled laws and otherwise known as Michigan's Fire Prevention Code." Appellant's brief at 27. The preamble to Michigan's Fire Prevention Code states in relevant part that the purpose of the Act is
 
 
 26
 to provide for the prevention of fires and the protection of persons and property from exposure to the dangers of fire or explosion; to authorize the investigation of fires and the discovery of crime or other offenses in relation thereto; to require the razing, repair, or alteration of the buildings, and the clearing and improvement of premises which constitute a fire hazard or a menace to the peace, security, or safety of persons or property; to control the construction, use, and occupancy of those buildings and premises for fire safety purposes; to provide for the certification of fire inspectors and the delegation of certain powers to those certified fire inspectors; to provide for the regulation of the storage and transportation of hazardous material; to provide for the issuance of certificates; to prohibit the use of certain fire extinguishers and fire extinguishing agents....
 
 
 27
 Introduction to the 1963 Fire Prevention Code, Act 207 P.A. of 1941 as amended. Moreover, a subsection of the Michigan Fire Prevention Code, Mich.Comp.Laws Sec. 29.5, provides:
 
 
 28
 Hazardous materials or other substances, including alcohol, gunpowder, dynamite, crude petroleum, or any of its products, fuel oils, pyroxylin, combustible finishes, and other commodities of a similar nature or quality shall be manufactured, kept or stored, sold, transported, or otherwise handled or disposed of in a manner and by a method as not to constitute a fire hazard or a menace to the public peace, health, or safety, or to endanger or cause loss, injury, or damage to persons or property.
 
 
 29
 Mich.Comp.Laws Sec. 29.5 (West 1994). Furthermore, Mich.Comp.Laws Sec. 29.3c(2) authorizes the Michigan Fire Safety Board to "promulgate rules for the storage, transportation, and handling of hazardous material and for the implementation of th[e] Act." Mich.Comp.Laws Sec. 29.3c(2) (1994). One of the rules promulgated by the Fire Safety Board was Rule 63(c)[3] of the Fire Prevention Code which provided:
 
 
 30
 A permanently out-of-use tank shall be a tank that has become defective and is not suitable for flammable liquid storage; or a tank that is out of use because it is no longer of incidental use to the type of occupancy on the property; or a tank that is classified as indefinitely out-of-use but which is not maintained in the manner approved herein for such tanks. Permanently out-of-use tanks shall be removed from the ground and the excavation backfilled to grade level. When practical difficulty or unnecessary hardship precludes removal of the tank, as in the case of structures above, or subgrade structures near the tank, the tank may be completely filled with sand or other approved material through an opening in the top of the tank. When it is impracticable to safeguard a tank in the foregoing manner mentioned in this paragraph, and the corrosion of the tank will not later endanger floors or foundations above or near the tank, the commissioner may permit the tank to be safeguarded by completely emptying it of its flammable contents and rendering it gas-free by an approved method. Permanently out-of-use tanks shall be safeguarded by the owner of the property on which the tanks are located, unless the last user of the tank is in control of the property, in which case it shall be his responsibility to so safeguard the tanks.
 
 
 31
 Rule 63(c) of the 1963 Fire Prevention Code, Act 207 P.A. of 1941 as amended.
 
 
 32
 In its countercomplaint, PRI alleged that pursuant to the state fire code and related rules, Unocal had a duty to remove the USTs from the property when it stopped using the property as a gas station in 1967. PRI further alleged that as a result of Unocal's breach of its duty to remove the USTs, PRI was required to remove the tanks by the State of Michigan.
 
 
 33
 In an order, dated November 8, 1993, the district court concluded that PRI's counterclaim for negligence failed to state a claim for relief under Fed.R.Civ.P. 12(b)(6) and dismissed the claim. Thereafter, on December 3, 1993, the district court granted PRI's motion for reconsideration of its order of November 8, 1993. The district court vacated its dismissal of PRI's counterclaim for negligence after concluding that PRI had "stated a prima facie case for negligence by demonstrating a possible violation by UNOCAL of Rule 63(c) of the Fire Prevention Code." J.A. 466.
 
 
 34
 Subsequently, on March 8, 1994, the district court granted summary judgment in favor of Unocal on PRI's counterclaim for negligence. Specifically, the district court found
 
 
 35
 that (1) the violation of Rule 63(3) of the Code is not relevant to the alleged negligence by UNOCAL, (2) the alleged violation cannot be used to create the presumption of negligence, and (3) the Defendants have failed to demonstrate that UNOCAL owed them a legal duty.
 
 
 36
 J.A. 723-24. More specifically, the district court found that, because PRI sought compensation for the harm caused by the environmental contamination of the property on Grand River Avenue, Unocal's violation of Rule 63(c) of the Michigan Fire Code, if any, was not relevant to the issue of negligence because the statute and regulations promulgated pursuant to it sought to prevent explosions and damage from fire in underground storage tanks filled with flammable liquids and not from environmental contamination. J.A. 721.
 
 
 37
 On March 21, 1994, PRI sought reconsideration of the district court's summary judgment of March 8, 1994. In its motion for reconsideration, PRI argued that the district court should reconsider its dismissal of its counterclaim for negligence because Mich.Comp.Laws Sec. 29.5 established that the state's fire prevention code and related regulations were applicable to environmental contamination. On March 5, 1994, the district court denied PRI's motion for reconsideration finding (1) that PRI was time barred from raising Mich.Comp.Laws Sec. 29.5 because it had failed to cite the provision in any of its previous filings with the court, and (2) even if the court considered Mich.Comp.Laws Sec. 29.5, it would not reach a result any different from its previous conclusions. J.A. 828. Rather, the district court stated that
 
 
 38
 [t]he statutory language [of Mich.Comp.Laws Sec. 29.5] ... does not add anything new.... [I]t confirms the original conclusion of the Court that this statute seeks to protect against the harms of fires and explosions from hazardous materials. Nothing within the statutory language corroborates the Defendants' suggestion that the "menace" sought to be prevented was an injury from environmental contamination.
 
 
 39
 J.A. 828-29.
 
 
 40
 As noted previously, we review the district court's grant of summary judgment de novo. Brooks v. Am. Broadcasting Cos., 932 F.2d 495, 500 (6th Cir.1991). Furthermore, this issue is one of state law, as it involves the statutory construction of the Michigan Fire Prevention Code. We review de novo the district court's determination of Michigan law. Salve Regina College v. Russell, 499 U.S. 225, 231 (1991).
 
 
 41
 Under Michigan law, "[t]o establish a prima facie case of negligence, a plaintiff must prove: (1) that the defendant owed a duty to the plaintiff; (2) that the defendant breached that duty (general and specific standards of care); (3) that the defendant's breach of duty was a proximate cause of the plaintiff's damages (cause in fact and legal cause); and (4) that the plaintiff suffered damages." Johnson v. Bobbie's Party Store, 473 N.W.2d 796, 800 (Mich.Ct.App.1991) (per curiam). "In a negligence case, a duty may be defined as 'an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.' " Sierocki v. Hieber, 425 N.W.2d 477, 478 (Mich.Ct.App.1988) (quoting Farwell v. Keaton, 240 N.W.2d 217, 219 (Mich.1976)). "The question whether a duty exists is one of law to be decided by the trial court." Sierocki, 425 N.W.2d at 478 (citing Smith v. Allendale Mut. Ins. Co., 303 N.W.2d 701, 709-10 (Mich.1981)).
 
 
 42
 "Under the negligence per se doctrine, the defendant in a negligence action may be held liable in negligence as a matter of law if his conduct amounted to a violation of a statute." Martin v. Ann Arbor R.R., 255 N.W.2d 763, 766 (Mich.Ct.App.1977). "For the statutory violation to constitute negligence per se ... the test of the statutory purpose doctrine must be satisfied." Id. (citing Zeni v. Anderson, 243 N.W.2d 270, 280 n. 22 (Mich.1976)). "However, it is well established that whereas a violation of a statute creates a rebuttable presumption of negligence, a violation of an ordinance or administrative rules and regulations is only evidence of negligence." Johnson, 473 N.W.2d at 801. "[B]efore the violation of an ordinance, rule, or regulation may be considered as bearing on the question of negligence, the court must determine that the purpose of the ordinance was to prevent the type of injury and harm suffered." Id; accord Boggerty v. Wilson, 408 N.W.2d 809, 816 (Mich.Ct.App.1987), cert. denied, 493 U.S. 1079 (1990).
 
 
 43
 "The use of a statutory violation to establish negligence is a matter of judicial discretion." Klanseck v. Anderson Sales & Serv., Inc., 393 N.W.2d 356, 360 (Mich.1986). The statutory purpose doctrine provides:
 
 
 44
 'The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part
 
 
 45
 (a) to protect a class of persons which includes the one whose interest is invaded, and
 
 
 46
 (b) to protect the particular interest which is invaded, and
 
 
 47
 (c) to protect that interest against the kind of harm which has resulted, and
 
 
 48
 (d) to protect that interest against the particular hazard from which the harm results.'
 
 
 49
 Ross v. Alexander, 254 N.W.2d 605, 607 (Mich.Ct.App.1977) (quoting Restatement (Second) of Torts Sec. 286).
 
 
 50
 Under Michigan law, "[t]he primary goal of statutory construction is to ascertain and give effect to the intent of the Legislature." Goodwill Community Chapel v. General Motors Corp., 503 N.W.2d 705, 707 (Mich.Ct.App.1993). "Legislative intent can be ascertained from examining the language of the act, the subject matter under consideration, the scope and purpose of the act, and other preceding statutes." Id. (citing Richmond Township v. Erbes, 489 N.W.2d 504, 510 (Mich.Ct.App.1992)). The Michigan Fire Prevention Code
 
 
 51
 is a remedial statute designed to prevent fires and protect persons and property from exposure to the dangers of fire and explosion. It was in part designed 'to provide for the regulation of the storage and transportation of hazardous materials.' Title Clause to Fire Prevention Code, M.C.L. Sec. 29.1 et seq.; M.S.A. Sec. 4.559(1) et seq. The act authorizes the state fire marshall to prevent and abate fire hazards detrimental to life and property. Douglas v. Edgewater Park Co. 369 Mich. 320, 329, 119 N.W.2d 567 (1963). The act further provides that a fire hazard of any nature is a nuisance. M.C.L. Sec. 29.23; M.S.A. Sec. 4.559(23).
 
 
 52
 Attorney Gen. v. Ankersen, 385 N.W.2d 658, 668 (Mich.Ct.App.1986). See also Douglas, 119 N.W.2d at 571 (stating:
 
 
 53
 It is quite clear that the [Fire Prevention Code] was passed in 1941, and that the rules and regulations were promulgated in 1943 ... While the statute does not specify the time for a compliance, it is plain from a review of its various provisions that it was intended to give the commissioner of Michigan State police the authority to effectuate without unnecessary delay the prevention and abatement of fire hazards detrimental to life and property.).
 
 
 54
 Thus, we conclude that the district court properly determined that a prima facie case of negligence for environmental contamination cannot be based on an administrative rule promulgated pursuant to the Michigan Fire Prevention Code, which was enacted to protect the public from the dangers associated with fires and explosions. In this case, the district court did not determine whether or not Unocal's failure to decommission the USTs on the Grand River Avenue property constituted a violation of the Michigan Fire Prevention Code. However, even if we were to assume arguendo that Unocal's failure to decommission the USTs did constitute a violation of the state's fire prevention code under Michigan law, particularly the statutory purpose doctrine, no presumption of negligence, or negligence per se, for environmental contamination can arise out of Unocal's alleged breach of an administrative rule promulgated under the fire prevention code.
 
 
 55
 First, the Michigan appellate courts have found that the purpose of the state's Fire Prevention Code was to protect the public from personal and property injuries caused by fires or explosions resulting from the careless handling and storage of flammable liquids. Administrative rule 63(c) was promulgated pursuant to the Fire Prevention Code, and the rule was not promulgated or intended to prevent environmental contamination. Thus, the harm sustained by PRI in this action, namely, environmental contamination, was not the type of harm which the Fire Prevention Code or related regulations sought to prevent.
 
 
 56
 Second, PRI is not within the class of persons intended to be protected by the Michigan Fire Prevention Code or the regulations promulgated pursuant to it. The Michigan appellate courts have concluded that the Michigan Fire Prevention Code was intended to abate fire hazards detrimental to life and property; namely, the code and related regulations were intended to protect persons who suffered injury or property damage due to fires or explosions resulting from the mishandling of flammable liquids. However, in this case PRI is seeking compensation for losses suffered and diminution of the value of its property due to an environmental injury. Clearly, PRI was not among the class of persons which the Michigan Fire Prevention Code was intended to protect.
 
 
 57
 Accordingly, PRI's argument that it is entitled to the presumption of negligence, or negligence per se, based upon Unocal's alleged violation of Rule 63(c) is meritless. Further, the district court properly found that no presumption of negligence arose from Unocal's alleged violation of Rule 63(c) because, even if Unocal had violated Rule 63(c), its violation would not satisfy the statutory purpose doctrine with regard to the harm suffered by PRI. Moreover, PRI's remaining arguments to the contrary are not persuasive. Accordingly, we conclude that the district court properly granted summary judgment in favor of Unocal on PRI's counterclaim for negligence.
 
 C.
 
 58
 PRI argues that the district court improperly granted summary judgment to Unocal for PRI's counterclaim for continuing trespass.[4] In its complaint, PRI asserts that the presence of the seven USTs is a continuing trespass to the Grand River Avenue property.[5] As earlier stated, the district court denied Unocal's first motion for summary judgment on PRI's counterclaim for continuing trespass and found that there was a genuine issue of material fact. However, on March 8, 1994, the district court granted Unocal's second motion for summary judgment by reasoning that a claim for trespass could not be made by PRI since it had sold the Grand River Avenue property. Responding to PRI's motion for reconsideration, the district court reversed that erroneous legal conclusion[6] in an order on May 9, 1994. However, the district court went on to hold that summary judgment was still appropriate since the land which had contained the USTs had been transferred by deed from Unocal to the Mayers, Unocal had no duty to remove the USTs.
 
 
 59
 PRI argues that in making that ruling, the district court impermissibly weighed the facts to determine that the Mayers would not have objected to seven USTs on their property. PRI argues that the record evidence establishes that the Mayers only intended to accept transfer of two, but no more than four, of the USTs. On the other hand, Unocal argues that the district court did not weigh the facts but instead simply determined that there was not a genuine issue of material fact.
 
 
 60
 Michigan law defines trespass as the unauthorized intrusion upon the private premises of another. Douglas v. Bergland, 185 N.W. 819, 820 (Mich.1921); Murphy v. Muskegon County, 413 N.W.2d 73, 77 (Mich.App.1987). A trespass occurs when a party fails "to remove from land in the possession of another a ... thing which he has tortiously erected or placed on the land," Restatement (Second) of Torts, Sec. 161 cmt. b, or when a party "fails to remove from the land a thing which he is under a duty to remove."[7] Restatement (Second) of Torts, Sec. 158(c). "[A] trespass may be committed on, beneath, or above the surface of the earth." Restatement (Second) of Torts, Sec. 159.
 
 
 61
 In the present case, Unocal did not tortiously place the USTs on the Grand River Avenue property since Unocal and its predecessor, The Pure Oil Company, owned the land when the USTs were placed on the property. However, Unocal may have had a duty to remove the USTs upon transfer of the land to the Mayers. The district court addressed this question in its summary judgment of May 9, 1994, and concluded that the Mayers intended to accept the USTs upon transfer of the Grand River Avenue property thereby discharging any duty of removal by Unocal.
 
 
 62
 The record before the district court showed that the Mayers admitted having knowledge of two USTs since Lawrence Mayer observed two USTs filled with sand. However, the earnest money receipt signed by the Mayers listed four tanks as equipment to be transferred with the property. Lawrence Mayer stated in his deposition regarding the existence of the USTs that "I didn't really care at the time. It was going to be a flower shop." J.A. 798. The deposition of Mayer also contained the following question and answer:
 
 
 63
 Q: So at that point in time, if there were ten tanks on the property or two tanks, it didn't make a speck of difference. Is that a fair statement?
 
 
 64
 A: Twenty-five years ago, man wouldn't have given a thought about that.... And, no, I wouldn't have give it a thought ...
 
 
 65
 J.A. 803. In addition, the deed transferring the Grand River Avenue property provided for the transfer of all appurtenances, and PRI did not dispute before the district court that the USTs were appurtenances. This evidence of record and the absence of any evidence indicating that the Mayers did not intend to accept the transfer of the USTs convinced the district court that summary judgment was appropriate as Unocal had no duty of removal.
 
 
 66
 PRI argues that, on the contrary, there is no evidence suggesting that the Mayers would have accepted transfer of seven USTs which were not all filled with sand and which would result in the remediation operation which subsequently occurred and shut down operations on the property for a over a year and a half. While that might be a logical argument to make, the deposition testimony of Lawrence Mayer indicates that had he known of seven USTs at the time he purchased the property, he still would have gone through with the purchase without requiring removal of the tanks. There is not a preponderance of evidence which would lead reasonable jurors to conclude that Unocal had a duty to remove the USTs upon the transfer of the property to the Mayers. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). In fact, there is no affirmative evidence whatsoever indicating that the Mayers ever intended to place a duty on Unocal to remove the USTs. Whenever a "possessor elect[s] to retain on the land as part of it a structure erected by the actor, the actor is under no duty to remove it." Restatement (Second) of Torts, Sec. 160 cmt. m. Since the record evidence is not sufficient to create a genuine issue of material fact as to whether the Mayers intended to accept transfer of the USTs, we conclude that the district court was correct in granting summary judgment to Unocal on PRI's claim for continuing trespass.
 
 
 67
 PRI's reliance on Rosenthal v. City of Crystal Lake, 525 N.E.2d 1176 (Ill.App.Ct.1988), is misplaced since in that case the issue was whether the underground sewer system was tortiously placed on the land. The court held that since the system was placed on the land without the consent of the landowner, it was a tortious act. Rosenthal, 525 N.E.2d at 1181. However, in the present case, Unocal's predecessor did not tortiously place the USTs on the Grand River Avenue property since it owned the property at that time.
 
 D.
 
 68
 PRI argues that the district court abused its discretion in refusing to allow PRI leave to amend its countercomplaint. "The decision to allow amendment in order to add an omitted counterclaim 'is a matter of judicial discretion, [and] it can be reversed on appeal only if the party can demonstrate that the court abused its discretion.' " Budd Co. v. Travelers Indem. Co., 820 F.2d 787, 791 (6th Cir.1987) (citing 6 C. Wright & A. Miller, Federal Practice & Procedure Sec. 1430 at 155 (1971). Fed.R.Civ.P. 13(f) allows a party to amend and add a counterclaim when the counterclaim was omitted "through oversight, inadvertence, or excusable neglect, or when justice requires ... by leave of court...."
 
 
 69
 On October 25, 1993, PRI filed a motion to amend its countercomplaint to add three state environmental statutes and one federal environmental statute as a basis for Unocal's liability. This motion to amend came after the action had been pending for over one year and came within two months of the trial date. PRI argued that discovery had revealed that the environmental statutes would provide the type of relief PRI was seeking through its common law actions for breach of contract and negligence. In opposing PRI's motion, Unocal argued that the amendment would be unfairly prejudicial by causing a delay in the proceedings and would cause additional discovery costs. On November 24, 1993, the district court denied PRI's motion to amend by ruling that
 
 
 70
 if this Court granted [PRI's] application, discovery would have to be reopened, the trial postponed, and new opportunities to file dispositive motions would be required. Clearly, the absence of these claims limited UNOCAL's approach to discovery and trial preparation. Additional and substantial burdens should not be imposed upon UNOCAL when the Defendants' failure to raise these new claims at an earlier time cannot be shown to be excusable neglect....
 
 
 71
 J.A. 439-40. PRI argues that the district court abused its discretion in denying PRI's motion to amend since, after the district court denied the motion, the district court allowed Unocal leave to file additional dispositive motions which delayed (and ultimately prevented) the start of the trial.
 
 
 72
 In Robinson v. Mich. Consol. Gas Co., Inc., 918 F.2d 579, 591 (6th Cir.1990), this court set out several factors to be considered in examining motions to amend: "[u]ndue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment ..." However, "[d]elay by itself is not sufficient reason to deny a motion to amend." Robinson, 918 F.2d at 591. Moreover, due diligence is a prerequisite to a party taking advantage of a court's power to freely grant leave to amend. United States v. Midwest Suspension and Brake, 49 F.3d 1197, 1202 (6th Cir.1995).
 
 
 73
 In the present case, PRI's amendment clearly would have caused a delay in the proceedings, and PRI gave no valid excuse for its delay in making the omitted counterclaims. Additionally, the district court did not abuse its discretion in finding that Unocal would be prejudiced with "additional and substantial burdens" since prejudice occurs whenever a party is required "to expend significant additional resources to conduct discovery and prepare for trial" or when trial is significantly delayed. Phelps v. McClellan, 30 F.3d 658, 663 (6th Cir.1994). Accordingly, we conclude that the district court did not err in denying PRI's motion to amend its countercomplaint.
 
 III.
 
 74
 For the reasons stated, the district court is AFFIRMED in all respects.
 
 
 
 [1]
 That sentence reads as follows: "However, nothing contained herein shall be construed to waive any rights [PRI] may have to pursue claims against Unocal not covered by the terms of this letter." J.A. 35
 
 
 [2]
 PRI also argues that the district court improperly granted Unocal's motion for summary judgment on Unocal's claim for breach of contract. In response, Unocal argues that PRI has waived appeal of this issue because it was not set out in PRI's statement of issues as required by Fed.R.App.P. 28(a)(3). Whether or not PRI waived the argument is immaterial because we have concluded that Unocal did not breach the letter agreement with PRI. The only remaining argument of PRI with respect to Unocal's claim for breach of contract is that PRI and Unocal do not agree on the amount of money in dispute, and, thus, there is a genuine issue of material fact. However, PRI's dispute with the specific amount of Unocal's figures was not presented to the district court until January 24, 1994, when PRI responded to Unocal's second summary judgment motion. Accordingly, these disputed facts were not before the district court when it ruled on Unocal's motion and can not be a basis for appeal as PRI has waived this issue. United States v. August, 984 F.2d 705, 714 (6th Cir.1992), cert. denied, 114 S.Ct. 158 (1993)
 
 
 [3]
 The parties and the district court have referred to this rule both as rule 63(c) and rule 63(3). For the sake of consistency, we shall refer to the rule as Rule 63(c)
 
 
 [4]
 Unocal argues that PRI has waived this issue on appeal by not including it in its statement of issues. PRI admits that it made an error by not including the trespass claim as it inadvertently typed "negligence" instead of "trespass" when typing issue four of its statement of issues. However, PRI included the trespass claim in its table of contents and in the argument section of its brief. Thus, we will use our discretion to hold that PRI did not waive this issue since the issue of continuing trespass is thoroughly discussed in the briefs of both parties. See United Transp. Union v. Dole, 797 F.2d 823, 827-28 (10th Cir.1986) (holding that when considering the issue of waiver, adequate briefing on the issue is an important factor)
 
 
 [5]
 PRI also asserts in its complaint that the contamination from the USTs is a continuing trespass. While neither the parties nor the district court discussed the issue, it should be noted that the contamination itself is a permanent injury and not a continuing trespass. See Graham Oil Co. v. BP Oil Co., 885 F.Supp. 716, 726 (W.D.Penn.1994). Only the presence of the USTs can constitute a continuing trespass
 
 
 [6]
 See Rosenthal v. City of Crystal Lake, 525 N.E.2d 1176, 1181 (Ill.App.1988) (holding that an action for continuing trespass may be maintained by any person who was ever in possession of the land at the time of the trespass); Restatement (Second) of Torts, Sec. 162 cmt d
 
 
 [7]
 PRI argues in its reply brief on appeal that the district court recognized that Unocal had a duty to remove the USTs. Appellant's reply brief at 24. However, a review of the citations PRI gives in support of this claim do not substantiate it. Rather, the district court was speaking in hypothetical language and made no concrete finding of a duty by Unocal to remove the tanks